SOUTHWESTERN BELL TELEPHONE COMPANY
*v.* ARKANSAS PUBLIC SERVICE COMMISSION

79-201                                    593 S.W. 2d 434

Opinion delivered January 28, 1980

552

554

*Wayne E. Babler, William C. Sullivan, D. D. Dupre; Hershel Friday* and *Hermann Ivester,* of *Friday, Eldredge & Clark,* for appellant.

*Robert H. Wood, Jr., Steven K. Cuffman,* and *Steve Clark,* Atty. Gen., by: *Michael O'Malley,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Chief Justice. This appeal is the product of the inexorable march of inflation. Appellant, Southwestern Bell Telphone Company (hereafter referred to as Bell) seeks a reversal of the circuit court's affirmance of the order of the appellee Arkansas Public Service Commission (hereafter called PSC) setting aside proposed new intrastate rate schedules filed by the telephone company on March 1, 1976, and allowing the company to file a new rate schedule designed to produce additional revenues amounting to slightly more than one-third of those anticipated from the schedule proposed by the company.

On March 1, 1976, the telephone company sought PSC approval of a new rate schedule pursuant to Ark. Stat. Ann. § 73-217 (Repl. 1957). It would have produced an increase of annual revenues to the company amounting to approximately $18,180,000. By an order entered March 29, 1976, the commission suspended the proposed rates for six months, the maximum period of suspension allowed under Ark. Stat. Ann. § 73-217 (b), the applicable statute. Pursuant to the provisions of that statute, the telephone company, on August 1, 1976, made the proposed tariffs effective under an ''Agreement & Undertaking'' approved by PSC, and these rates were collected until June 20, 1978. The six months' suspension expired on September 29, 1976, both by the terms of the order and by operation of law. Hearings on appellant's application were not even commenced until November 15, 1976. They were concluded on November 24, 1976. Briefing time was allowed thereafter and the last briefs were filed on January 3, 1977. No order was entered by PSC until September 1, 1977. That order not only set aside the rates proposed by the telephone company, it also required the refund of all revenues collected by the company on the basis of its proposed rates in excess of those authorized in the order. On December 9, 1977, PSC entered an amended order authorizing an additional $26,120 in annual revenues.

The application filed by the telephone company was based upon a rate of return of 9.27 percent on the original cost of its property used in providing intrastate telecommunications service in Arkansas based on a test year ending December 31, 1976.. This rate of return had been approved by PSC just six months prior to the filing of this application in the last previous rate proceeding involving appellant. Appellant asserted that the increase authorized by the earlier proceeding had proven insufficient to produce the rate of return allowed. The order entered September 1, 1977, as amended, fixed the rate of return at 8.31 percent and allowed increased annual revenues based on that rate applied to a test year rate base valued as of June 30, 1976.

Appellant's petition for review by the circuit court was filed November 11, 1977, after PSC had failed to act upon appellant's petition for rehearing filed September 21, 1977.

The circuit court affirmed the PSC order on March 22, 1979.

Bell has presented its arguments in nine (stated) points for reversal. The arguments and contentions made under those points are to some extent overlapping and sometimes repetitive. Many of them would be more appropriately addressed to PSC than to the courts. We will endeavor to deal with Bell's basic arguments without attempting to treat the individual points separately. We must, however, give due regard to the limitations on the scope of judicial review and to the expertise of the commission. The scope of judicial review is neither so narrow as PSC would have it nor so broad as Bell asks us to make it. It is fixed by Ark. Stat. Ann. § 73-229.1 (Repl. 1979). The courts can only determine whether: (1) the commission's findings as to the facts are supported by substantial evidence; (2) the commission has regularly pursued its authority; and (2a) the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or the State of Arkansas. It is only the findings of fact that are tested by the standard of substantial evidence, which is a question of law. *Arkansas Public Service Com'n.* v. *Continental Telephone Co.*, 262 Ark. 821, 561 S.W. 2d 645; *State Highway Com'n.* v. *Byars*, 221 Ark. 845, 256 S.W. 2d 738; *J. L. Williams & Sons* v. *Smith*, 205 Ark. 604, 170 S.W. 2d 82; *St. Louis Southwestern Ry. Co.* v. *Braswell*, 198 Ark. 143, 127 S.W. 2d 637. All of the questions to be determined, then, are questions of law. In answering these questions, the courts may not pass upon the wisdom of the commission's actions or say whether the commission has appropriately exercised its discretion. *City of Ft. Smith* v. *Southwestern Bell Telephone Co.*, 220 Ark. 70, 247 S.W. 2d 474; *Allied Telephone Co.* v. *Arkansas Public Service Com'n.*, 239 Ark. 492, 393 S.W. 2d 206; *Arkansas Power & Light Co. v.* Arkansas Public Service Com'n., 226 Ark. 225, 289 S.W. 2d 688; *Harding Glass Co.* v. *Arkansas Public Service Com'n.*, 229 Ark. 153, 313 S.W. 2d 812. The judicial branch of the government must defer to the expertise of the commission. *Arkansas Power & Light Co.* v. *Arkansas Public Service Com'n.*, supra. See also, *Fisher* v. *Branscum*, 243 Ark. 516, 420 S.W. 2d 882. Judicial review is not reduced to a formality, however, and it is for the courts to say whether there has been an arbitrary or

unwarranted abuse of the commission's discretion, even though considerable judicial restraint should be observed in finding such an abuse. *Incorporated Town of Emerson* v. *Arkansas Public Service Com'n.*, 227 Ark. 20, 295 S.W. 2d 778; *Arkansas Public Service Com'n.* v. *Continental Telephone Co.*, supra. It is not for the courts to advise the commission how to discharge its functions in arriving at findings of fact or in exercising its discretion. *Arkansas Power & Light Co.* v. *Arkansas Public Service Com'n*, supra; *Ohio Bell Telphone Co.* v. *Public Utilities Com'n.*, 301 U.S. 292, 57 S. Ct. 724, 81 L. Ed. 1093 (1937). On the other hand, it is clearly for the courts to decide the questions of law involved and to direct the commission where it has not "pursued" its authority in compliance with the statutes governing it or with the state and federal constitutions. In questions pertaining to the regular pursuit of its authority, the courts do have the power and duty to direct the commission in the performance of its functions insofar as it may be necessary to assure compliance by it with the statutes and constitutions. The question of reasonableness of the commission's actions relates only to its findings of fact and to a determination of whether its action was arbitrary.

We must remember that the commission action has been reviewed in the circuit court and that the burden is on the appellant to demonstrate error in that court's judgment. See *Fisher* v. *Branscum*, supra.

Appellant first contends that its proposed rates became effective upon the expiration of the suspension and, as a result, none of the revenue collected prior to September 1, 1977, is subject to refund. The suspension order provided that the rates were suspended for six months, "or until such earlier time as the Commission may order." Appellant argues that its proposed rates became effective on September 30, 1976, and that PSC lost its power to act with regard to the rates and any revenues collected under them. The commission is authorized to suspend proposed rates pending its investigation and decision, but not for a period to exceed six months. There is no indication whatever of any legislative intent that PSC should entirely lose jurisdiction of the rate proceeding by its failure to reach a decision within the sus-

pension period. By the same token, the time limitation is not meaningless, as it would be, if the refund order is held valid. It should be remembered that the hearings on the rate increase were not even commenced during the suspension period. The only purpose of the limitation on the suspension is to prevent the ''regulatory lag'' between the filing of an application for a rate increase and the commission's decision from having a confiscatory tendency. If the commission's decision can be delayed for 18 months after the filing of the application by the utility, it could be delayed for two or three times that long. In these days of galloping inflation, the passage of time can be crucial. Perhaps the delay was attributable to the heavy load falling upon PSC as a result of inflationary trends. If, however, the utility has no protection from a long delayed decision which requires a refund, repetitive applications for rate increases will be filed by it during the pendency of its initial application. This would only serve to increase the workload of the commission and produce additional delay. The time limitation must be given some meaning. We take it to mean that, in this case, the commission had no authority to order a refund of revenues collected on the basis of the proposed rates between the date of the expiration of the suspension order and the date of the order fixing the rates allowed. By the clear language of § 73-217, it is only the operation of the rates that may be suspended, but that suspension cannot exceed six months. See *New England Telephone & Telegraph Co.* v. *Public Utilities Co.*, 362 A. 2d 741 (Me., 1976); *State* v. *Montana-Dakota Utilities Co.*, 89 N.W. 2d 94 (N.D., 1958). On the other hand, we do not agree with appellant that refunds of collections made between August 1, 1976 and September 30, 1976, could not be ordered because no valid rate order was entered within the time limitation on the power of suspension in § 73-217. See *Application of Montana-Dakota Utilities Co.*, 102 N.W. 2d 329 (N.D., 1960). Bell had no vested rights in collections under bond of the difference between the old rates and the new ones it proposed collected during the suspension period. *Application of Montana-Dakota Utilities Co.*, 111 N.W. 2d 705 (N.D., 1961).

We reject PSC's suggestion that a holding that it may not order a refund of revenues collected after the expiration

of the suspension period would constitute a court-imposed time limit on the commission's deliberations. The time limit was imposed by the General Assembly. It must be remembered that the PSC is a creature of the legislature and that, in rate-making, it is performing a legislative function, which has been delegated to it. *City of Ft. Smith* v. *Department of Public Utilities*, 195 Ark. 513, 113 S.W. 2d 100; *Arkansas Power & Light Co.* v. *Arkansas Public Service Com'n.*, 226 Ark. 225, 289 S.W. 2d 668. The commission was created to act for the General Assembly and it has the same power that body would have when acting within the powers conferred upon it by legislative act. *Department of Public Utilities* v. *Arkansas Louisiana Gas Co.*, 200 Ark. 983, 142 S.W 2d 213. The General Assembly certainly has not surrendered the power to fix time limitations on the actions of its own agency. PSC's order of suspension clearly recognized that the limitation on its suspension of rates had some significance by suspending "new intrastate rates, tolls and charges . . . for a period of six (6) months, or until such *earlier* time as the Commission may order." [Emphasis ours.]

If PSC does not enter a suspenion order prior to the stated effective date of the proposed rates, those rates, by the clear language of Ark. Stat. Ann. § 73-217 (a) and (b), would "go into effect" or "become effective." The suspension order simply suspends the proposed rates for six months "beyond the time when such rate or rates would otherwise go into effect." Appellee has not suggested any other meaningful application of the six months' limitation.

PSC does argue that its action was proper under Ark. Stat. Ann. § 73-217 (c) because it is directed to determine and fix the just and reasonable rate or rates to be charged or applied by the utility for service "from and after the time said new rate or rates took effect," and in the same order fix the amount or amounts plus interest, if any, to be refunded to the consumer which were collected by the utility "during the time such new rate or rates were in effect." When all the subsections of § 73-217 are read together, it is clear to us that it was contemplated by the General Assembly that the investigation and hearing should be completed and an order for a refund made during the suspension period. We agree that

PSC had the power and authority to order the refund or any rates collected during the suspension period which it ultimately found to be excessive, in spite of the time limitations in § 73-217. We did not even approach the questions involved here in *Department of Public Utilities* v. *McConnell*, 198 Ark. 502, 130 S.W. 2d 9, relied upon by appellee.

PSC also argues that Bell's "Agreement and Undertaking" guaranteed repayment of any amount which the commission found excessive. The particular language relied upon is:

Should any portion of such rates in excess of the rates in effect immediately prior to August 1, 1976, be finally determined to be excessive by the Commission, Southwestern Bell Telephone Company does hereby agree and undertake to insure the prompt payment of any refunds ordered by the Commission together with interest thereon not to exceed Ten Percent (10%) per annum.

Certainly this agreement is not to be taken as an open-ended commitment to pay a refund directed by an order that is made without authority. Furthermore, we take this agreement to be the "bond" or substitute therefor required by Ark. Stat. Ann. § 73-217 (b). Thus, the agreement was, in effect, a statutory bond. As such, the terms of the statute are considered as if they are written into the bond, and, in determining the extent of liability on the bond, the language of the statute is controlling over the language of the bond. *Miller* v. *State*, 262 Ark. 223, 555 S.W. 2d 563; *Empire Life & Hospital Insurance Co.* v. *Armorel Planting Co.*, 247 Ark. 994, 449 S.W. 2d 200. When this agreement is read in the light of the statute, it does not require any refund that the commission could not order under the statute. In other words, the agreement could not bind Bell to do more than the commission could require under the statute and the agreement cannot have the effect of increasing PSC's power or Bell's obligation.

In ordering the refunds for rates collected after the expiration of the suspension order, PSC did not regularly

pursue its authority, so that portion of its order must be set aside upon judicial review, and the judgment of the trial court reversed to that extent.

Appellant also contends that the PSC order of September 1, 1977, is totally void, or, in the alternative, can only have prospective effect because the commission failed to enter its order within 60 days of the hearing as required by Ark. Stat. Ann. § 73-229 (Repl. 1979). This 60-day period expired on January 23, 1977, if it began to run when the hearing of evidence was concluded. If the filing of briefs is considered as a part of the hearing, the 60-day period expired on March 4, 1977, which was nearly six months prior to the date when the order was finally entered.

We have previously held that PSC was not deprived of jurisdiction after the expiration of the 60-day period to act on a petition to close a business office of a utility. *City of DeWitt v. Public Service Com'n.*, 248 Ark. 285, 451 S.W. 2d 188. Appellant distinguishes that situation from this by saying that in *DeWitt* the limitation on time was ''an immaterial matter of convenience,'' while in a rate case time is an extremely critical matter, as shown by the intricate timing mechanisms established in Ark. Stat. Ann. § 73-217 and by the apparent discriminate use of the words ''shall'' and ''may'' in § 73-229. In *DeWitt* we held that the statute was directory and that non-compliance did not void the PSC order.

Appellant's arguments are appealing, but we reject them largely because there would be gross inconsistency in saying that the same words in the same statute have the effect of voiding commission action in one type of case governed by the statute and not in another. It is hardly possible to say that the statutory provision is directory in one type of case and mandatory in another, and there is no language in *DeWitt* that admits that possibility.

To hold PSC action in this case void because it was robbed of jurisdiction and power on the basis of this statute would, in effect, overrule *DeWitt*. Since *DeWitt* itself involved a construction of the statute, we are reluctant to do

this, particularly in view of the fact that the General Assembly made changes in the section involved after our decision in *De Witt* without affecting our interpretation. Our statute is unlike the one considered in *Mt. Konocti Light & Power Co.* v. *Thelen*, 170 Cal. 468, 150 P. 359 (1915), relied upon by appellant. The statute there related to action upon petitions for rehearing and specifically provided that, upon failure of the commission to act within the time allowed by the statute, any party to the proceeding could take the commission's order to be affirmed. Appellant advances the argument that *De Witt* is distinguishable because the PSC order involved there had no retroactive effect. If, indeed, this part of the statute is directory but not mandatory, we cannot well hold that PSC's failure to act deprived it of the power to order a refund of the additional revenues collected under bond, even though we do find that failure to render a decision within 60 days after the filing of the briefs in the case renders the final action of PSC prospective in all other respects. We had no occasion to consider this question in *De Witt*. On this point, we find the holding in *Fuller- Toponce Truck Co.* v. *Public Service Com'n.*, 99 Utah 28, 96 P. 2d 722 (1939) very persuasive. The Utah court held that the effect of delay in rendering a decision beyond a similar statutory limitation was to allow the parties to act in the interim without fear of penalty, but not to deprive the commission of jurisdiction and power to act prospectively. See also, *Hartman* v. *Glenwood Telephone Membership Corp.*, 197 Neb. 359, 249 N.W. 2d 468 (1977).

Bell contends that it was deprived of due process of law because the PSC, without notice to Bell until the PSC staff filed its testimony only 14 days before commencement of the hearing on Bell's application, changed the methodology followed by the commission in its order of September 4, 1975, upon Bell's application for a rate increase made in that year. As a result, PSC concluded that Bell was entitled to a rate of return of 8.31 percent rather than the 9.27 percent rate of return authorized by PSC in the 1975 order. Bell argues that, in filing the application involved here, it relied and had a right to rely, upon the rate then fixed. Bell emphasizes the fact that its application was in strict conformity with the previous order and the accounting procedures adopted in that pro-

ceeding by PSC as proposed by Touche Ross & Company, an independent accounting firm employed by the PSC staff. The staff conceded that this was true. Bell's statement that the rates allowed in 1975 had failed to produce the rate of return allowed in the same order and that its application was based upon that failure is not seriously contested.

The differences in methodology and changes in procedure of which Bell complains relate to the end of test periods used in determining company expenses, revenues and investment in plant and to the approach to the rate of return necessary to enable the company to obtain capital necessary for its operations.

Bell's proposed test year ended December 31, 1976, ten months after the date of the application. Bell calculated that, at the end of the test year, its capital structure would consist of 54.11 percent common equity, 39.79 percent debt and 6.10 percent cost-free capital, and its embedded cost of debt would be 7.11 percent. Applying 12 percent return on equity, as authorized by the 1975 rate order, would produce an overall rate of return of 9.32 percent, but Bell sought rates which would produce only an overall return of 9.27 percent on the December 31, 1976, rate base. Bell calculated that, based upon adjustments to the December 31, 1976 test year, in conformity with methods approved by PSC, Bell's return, based on the rates allowed in the 1975 order, would amount to only 6.85 percent. J. B. Nichols, Bell's vice-president and general manager for Arkansas, testified that, in framing the application, the methodology employed by PSC in its last previous rate case, including all the disallowances to revenues, expenses and investments, was utilized. This was also conceded. This witness said that the test year was chosen because of the attrition that occurs over a period of time due to the addition of new plant investment at higher cost than previous plant investment and the effect of delay which would occur during the consideration of Bell's request for rate relief. He stated that rate relief based solely upon the relationship among revenues, expenses, and investment that existed in the past would prevent a utility from realizing the allowed rate of return either at the time of the order or at any time in the future and that Bell never caught up with its

growth when a truly historical test period was used. He said that, at the time he testified, he had found it necessary to change certain projections made in April for the end of 1976. At least one of the changes was based upon data from the first seven months of 1976. Nichols pointed out that a future test year, consisting of nine months of actual data and three months of projected data, had been used in its last previous rate case. He said that Bell had furnished monthly data to the commission staff on actual performance as compared to forecast performance which showed that revenues and expenses had been within one to one and one-half percent of the forecasts, and that Bell's record for forecasting, which had been furnished to the commission staff, demonstrated a very high degree of accuracy over a period of ten years. W. W. Lampkin, Bell's chief supervising accountant for Arkansas, testified that, during that period, Bell's actual operating revenues had averaged 0.6 percent below that budgeted and its operating expenses, 1.1 percent above that budgeted. Bell's witnesses pointed out that at the time of the hearings in the middle of November, 1976, the idea that their proposed test year was a future test year was virtually moot. They also testified that, in calendar year 1975, no commission in the country had allowed the Bell system a rate of return on common equity as low as its actual return. According to them, this fact demonstrated that future test years had become necessary for utilities because the expense of future growth was greater than the growth in revenue produced. Bell's chief supervising accountant said that a future test year required certain forecasts of changes in the economy that might occur and that projections were made from historical trends.

Jerrell Clark, Chief of Accounting & Finance with PSC, chose the test year ending June 30, 1976, because it was based upon actual audited results of operations for that 12-month period. He said that it had been adjusted to year end level and for known changes in revenue and expenses for one year, assuming no growth. Clark said that Bell's future test year required projections with projections.

Lampkin elaborated on the reasons for the test year selection made by Bell, saying that there were three reasons:

first, an attempt to reflect the condition which could reasonably be expected to exist at the time of the hearing, recognizing that rates are made for the future; secondly, the company's historically good job of estimating future levels of revenues, expenses and investment, and, lastly, counteraction of the regulatory lag. He said that, at the time of the hearing, the staff's test period did not give an accurate picture of Bell's financial picture, and that the use of such a test period would require Bell to seek additional rate relief in a very short time, which he believed was not in the best interest of the public, the commission, or Bell.

Bell produced evidence that a minimum return of 14 percent on equity capital was required by it in order to raise large amounts of equity capital, that Bell's cost of long term debt was 8.42 percent and that its embedded cost of debt was 6.75 percent as of February, 1976. This testimony was given by Bell officers.

Basil L. Copeland, an economist on the staff of PSC since August, 1975, recommended a rate of return of 8.28 percent on the rate base, which he said would produce a return of 8.82 percent on investor supplied capital, including a return of 11.5 percent on American Telephone & Telegraph Company (hereafter referred to as A T & T) common equity. According to him, the 9.27 percent rate previously allowed did not take into consideration the effect of A T & T leverage on A T & T's ability to earn a given return on equity. This was important because Bell is a wholly owned subsidiary of A T & T. In this situation, according to Copeland, there is a ''double leverage'' which exists in a holding company arrangement when leverage, i.e., debt, exists at the parent as well as the subsidiary level, and, unless this double leverage is given effect by a compensating adjustment in calculating the cost of capital, that cost will be incorrectly calculated and the subsidiary may earn more than its true cost of capital. Copeland explained two acceptable methods of calculating the cost of capital for a wholly owned subsidiary when double leverage exists. One of them used the subsidiary's debt and equity ratios, but only permitted the subsidiary to earn its parent's cost of capital on its equity. The other used a consolidated capital structure. He recommended that the commission use the first method, because

there would likely be variations in capital structures and embedded debt costs among subsidiaries. Copeland said that the method he had used to calculate Bell's cost of capital had been adopted by commissions in Iowa, Minnesota, New Jersey, New York and Wisconsin. He said that the methods universally employed by experts to estimate the cost of equity were subjective and amenable to any result desired. He explained a rather complicated mathematical formula which he said produced an objective result.

In rebuttal, Bell offered the testimony of William P. Dukes, Professor of Finance at the College of Business Administration of Texas Tech University. He pointed out that Copeland's recommended rate of return was below the 8.31 percent reported in the Wall Street Journal on November 10, 1976, as the AAA utility bond rate. He disagreed with Copeland's approach and took the position taken by the Tennessee Public Service Commission, i.e., cost of equity is a subjective factor which cannot be determined by precise mathematical formula but requires the application of informed judgment. He and other witnesses stated that Copeland had misapplied the basic model from which he had derived his formula, and that the formula incorporated economic variables which were unlikely to be repeated and assumed market equilibrium during a period when the "swings" were the widest in market history. These witnesses pointed out other matters which they took to be flaws in Copeland's approach and in his formula.

We have been troubled by the apparent inconsistency in PSC's approval of different methods of accounting and different methods of computation of rates of return on different occasions, fully recognizing that it may be quite difficult to establish hard and fast rules to be utilized and followed in determining a fair rate of return but, at the same time, thinking that a more uniform application of established and predictable criteria would lead to fairer and more understandable results. *Arkansas Power & Light Co.* v. *Arkansas Public Service Com'n.,* 261 Ark. 184, 546 S.W. 2d 720. While we understand appellant's bewilderment, neither it, nor our concern, can be translated into a judicial mandate requiring the commission to take the same approach to every rate

application, or even to consecutive applications by the same utility, when the commission, in its expertise, determines that its previous methods are unsound or inappropriate to the particular application.

In effect, Bell is asking us to apply the doctrine of res judicata to require PSC to apply the methodology used by it in entering the 1975 order. But res judicata has little application to regulatory action by an agency in fixing utility rates, because rate-making is a legislative, not a judicial function. *Duquesne Light Co.* v. *Pennsylvania Public Utility Com'n.*, 176 Pa. Super. Ct. 568, 107 A. 2d 745 (1954); *State* v. *Alabama Public Service Com'n.*, 293 Ala. 553, 307 So. 2d 521 (1975); *General Telephone Co. of Southwest* v. *Robinson*, 132 F. Supp. 39 (E. D. Ark. 1955). It has been held that every rate order may be superseded by another, not only when conditions change, but also when the administrative understanding of the same conditions changes. 2 Davis, Administrative Law Treatise 610, § 18.09. See also, *Rockwell Lime Co.* v. *Illinois Commerce Com'n.*, 373 Ill. 309, 26 N.E. 2d 99 (1940); *State Airlines, Inc.* v. *Civil Aeronautics Board*, 174 F. 2d 510 (D.C. Cir., 1949), reversed on other grounds, 338 U.S. 572, 70 S. Ct. 379, 94 L. Ed. 353 (1950).

In *Arkansas Power & Light Co.* v. *Arkansas Public Service Com'n.*, 226 Ark. 225, 289 S.W. 2d 668, we held that PSC was not bound by an earlier order authorizing the inclusion of construction work in progress in a utility's rate base, and that the constitutional rights of the utility were not invaded by a change in that order, so long as proper notice was given to the utility. In that case, we relied heavily upon the holding of the Vermont Supreme Court that a commission such as PSC is not bound to the service of any formula or combination of formulas. The Vermont court had pointed out that, in *Federal Power Com'n.* v. *Natural Gas Pipeline Co.*, 315 U.S. 575, 86 L. Ed. 1037, 62 S. Ct. 736 (1942), the United States Supreme Court had held that such agencies are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. We have also held that no public utility has a vested right to any particular method of valua-

tion. *City of Ft. Smith* v. *Southwestern Bell Telephone Co.,* 220 Ark. 70, 247 S.W. 2d 474. When we made that statement, we were considering rate base, but, of course, that is an important element in fixing rates. The principle is just as applicable to rate of return — and both factors are involved here. The commission has a wide discretion in choosing its approach to rate regulation. *New England Telephone & Telegraph Co.* v. *Dept. of Public Utilities,* 371 Mass. 67, 354 N.E. 2d 860 (1976). The differences involved here related to the fixing of rates on the application now under consideration and on previous applications. The rate of return was diminished by use of an approach involving a method which took into consideration the "leverage" attributable to the fact that Bell is a wholly owned subsidiary of American Telephone & Telegraph Company. It is the result reached, not the method employed, that is controlling, and it is not the theory, but the impact, of the rate order, that counts in determining whether rates are just, reasonable, lawful, and non-discriminatory under § 73-217. If the total effect of the rate order cannot be said to be unjust, unreasonable, unlawful or discriminatory, judicial inquiry is concluded, and infirmites in the method employed rendered unimportant. *Federal Power Com'n.* v. *Hope Natural Gas Co.,* 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944).

We are not possessed of the expertise necessary to evaluate the testimony of the experts in the field of economics. Evaluation of the testimony was for the commission, not the courts. *Arkansas Public Service Com'n.* v. *Continental Telephone Co.,* 262 Ark. 821, 561 S.W. 2d 645. We are in no position to say that the testimony of Copeland had no reasonable basis. This we would have to do, in order to hold that it did not constitute substantial evidence. *Wallace* v. *Williams,* 263 Ark. 702, 567 S.W. 2d 111; *Arkansas State Highway Com'n.* v. *Geeslin,* 247 Ark. 537, 446 S.W. 2d 245.

The test year to be used is a matter lying within the discretion of the commission, although the commission should consider complete and accurate information with respect to a later period of time, when available, as a check on the continuing validity of the test year experience in a

period of rapid change. *Matter of Wilmington Suburban Water Corp.*, 367 A. 2d 1338 (Del. Super., 1976). Both Clark for the PSC and Lampkin for Bell testified as to proper adjustments to be made on account of actual experience between June 30, 1976, made on account of actual experience between June 30, 1976, and the date of the hearing. The commission, in its order, recognized the necessity for making these adjustments, and did so, following its staff recommendations to a great extent. The test year was a matter lying within the discretion of the commission and it preferred a historical test year because of the ability of its staff to audit the financial data presented by the utility, because some elements are eliminated, and because a future test year is not amenable to verification. We have held that the commission should not use a test year ending after the date of its hearing because promises and predictions are not a substitute for proof. *City of Ft. Smith* v. *Southwestern Bell Telephone Co.*, 220 Ark. 70, 247 S.W. 2d 474.[1] The only hesitation we have in holding that PSC did not abuse its discretion is the fact that the test year adopted ended some 15 months prior to the commission's decision. We conclude, however, that we are in no position to hold that there was a clear abuse of discretion.

In further pursuing Bell's argument that its constitutional rights were violated, we first point out that we do not consider the fact that Bell had no notice that the PSC staff would recommend a change in methodology and procedures followed in considering Bell's last previous rate application until 14 days prior to the hearing, because Bell proceeded without asking that it be given additional time to rebut the testimony offered by the staff upon its assumption that PSC would reject the staff's approach, and because Bell did actually attack the staff's methods by rebuttal testimony, includ-

---

[1] It may be that the march of inflation will require different approaches in the future. We recognized in the cited case that rates fixed must be reasonable and just for a reasonable time in the future. There we approved consideration of anticipated future extensions by a utility. It may well be that a factor for anticipated inflation will become a necessary ingredient in rate determinations, if annual, or even more frequent rate applications are to be avoided, but we are in no position to say that there was proof in this case that would have required the incorporation of such a factor in the formula used by PSC.

ing that of an independent expert witness whose qualifications were impressive.

Since Bell had no vested right in the methodology or formulas previously used or the procedures followed by the commission and since it was afforded full opportunity to show that the changes made by the commission in the methods and procedures used in regard to Bell's last previous rate application were improper, we find no denial of due process of law. The Fourteenth Amendment's protection of property is a safeguard of the security of interests that one has already acquired in specific benefits, to which he has a legitimate claim of entitlement, rather than an abstract need or desire. *Board of Regents* v. *Roth,* 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). Bell is in no position to say that it was denied due process of law.

In considering contentions that a PSC order prescribing rates is repugnant to the due process clause of the Furteenth Amendment and that it deprives a utility of its property without just compensation, the order must be viewed as having the same force as would a like enactment by the General Assembly. *Bluefield Waterworks & Improvement Co.* v. *Public Service Com'n.,* 262 U.S. 679, 43 S. Ct. 675, 67 L. Ed. 1176 (1923). The question, according to *Bluefield,* is whether the rates fixed are confiscatory. A utility which would upset a rate order on the constitutional grounds asserted by Bell carries the heavy burden of showing that it is invalid because it is unjust and unreasonable in its consequences. If the total effect of the rate order cannot be said by the reviewing court to be unjust or unreasonable, the fact that the method used by the regulatory body to reach its result may contain infirmities is not important. *Federal Power Com'n.* v. *Hope,* 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944). When we give appropriate deference to the expertise of PSC, and view the PSC order as having the same force as a legislative enactment, we must say that Bell has failed to meet its heavy burden of showing that the rate order was confiscatory and Bell's constitutional rights violated.

Bell also contends that the commission abused its dis-

cretion and denied Bell due process of law by failing to grant its petition for rehearing. This petition was filed on September 20, 1977. In that petition, Bell alleged that the delay in acting upon its rate application, coupled with the use of a rate base which represented values 14 months prior to the PSC order, resulted in a confiscation of Bell's property in violation of the state and federal constitutions. It also incorporated many of its contentions previously set out in this opinion. The basis of Bell's argument that the rates fixed by the PSC order were confiscatory was its contention that the PSC finding that Bell's cost of equity was 10.2 percent was unreasonably low and not based upon substantial evidence, and that the adoption of the test period ending June 30, 1976, was inconsistent with inflationary economic development during the period intervening between the end of that period and the date of the order. Most of the petition was devoted to arguments and contentions made in the trial court and in this court as to limitations on the commission's powers by time schedules set out in the governing statutes. Bell asked that the PSC order of September 1, 1977, be abrogated or modified to approve the rates as filed and to eliminate or modify the obligation to make refunds and for all other relief to which it might be entitled. The petition was supported by affidavits of James B. Nichols, Vice-President and General Manager for Arkansas, and W. W. Lampkin, an accountant who had testified on behalf of Bell. By his affidavit, Nichols undertook to demonstrate that between June 30, 1976, the end of the test year adopted by the commission, and September 1, 1977, the date of the PSC order, Bell had invested $139,000,000 in Arkansas, only part of which was assigned to interstate operations. In his affidavit, Lampkin stated that Bell had an annual revenue deficiency of $16,885,000, even at the 8.31 percent rate of return authorized by PSC and that, as of June 30, 1977, appellant would earn no more than 7.2 percent on its investment.

We agree with appellee that the granting or denial of a petition for a rehearing is a matter resting largely within the discretion of a regulatory agency in rate cases. The real question before us is whether the denial of the petition for rehearing was an abuse of the commission's discretion. Bell's arguments that it is not receiving any return on approx-

imately $62,000,000 invested in its plant between the end of the test year and the PSC order, and the obvious fact that a regulated business cannot adjust its prices to meet inflationary increases in its costs, as an unregulated business can, are very appealing. They emphasize the necessity for more prompt action on a rate application than was taken here. After deliberate consideration of these arguments, we have finally concluded that we should not say that there was an abuse of discretion in this case. It seems to be the general rule that the denial of a petition for rehearing by an agency such as PSC should be set aside on judicial review only for the clearest abuse of discretion. See *United States* v. *Pierce Auto Freight Lines,* 327 U.S. 515, 66 S. Ct. 687, 90 L. Ed. 821 (1946); *Northeast Broadcasting, Inc.* v. *Federal Communications Com'n.,* 400 F. 2d 749 (D.C. Cir., 1968); *Reese Sales Co.* v. *Hardin,* 458 F. 2d 183 (9 Cir., 1972).

In view of the limited scope of judicial review of the action of an agency performing a legislative function, we deem this rule to be appropriate and conclude that appellant has not shown such a clear abuse of discretion that overturning the commission's action is warranted in this case, in spite of the fact that we feel that PSC approached the outer limits of its latitude of discretion. It was pointed out in *Interstate Commerce Com'n.* v. *Jersey City,* 322 U.S. 503, 64 S. Ct. 1129, 88 L. Ed. 1420 (1944), that there is always a gap between the time the record is closed and the time the administrative decision is promulgated, particularly when (as here) the issues are difficult, the evidence intricate and the consideration of the case careful and deliberate. The court also referred to *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 284 U.S. 248, 52 S. Ct. 146, 76 L. Ed. 273 (1932), upon which Bell relies, and pointed out that its effect had been promptly restricted to the special and exceptional facts there involved and that it stood virtually alone, as an isolated instance of that court's interference with the exercise of the discretion of the Interstate Commerce Commission's granting or refusing to reopen a hearing. The exceptional facts there involved were the closing of the record in September, 1928, the entry of an order to be effective on June 1, 1931, without reopening the proceeding and taking further evidence, and the drastic reduction in the operating

income of the carriers involved in the depression year of 1930, which results in impairment of their credit. We have concluded that the facts in this case approach, but do not reach, the exceptional situation there involved. The time lapse is great, but not as long, even if the effects of inflation are taken to be as great as those of the Great Depression, and there is no showing that Bell's income has been so drastically affected that its credit is impaired. In arriving at our decision, we have considered the fact that Bell was not totally without any other remedy. Bell relied upon a test period ending December 31, 1976. It certainly had no basis for assuming that PSC would act on a test period other than the one suggested by Bell or that proposed by the staff. There is nothing in the laws governing utility rate-fixing that would have prevented Bell from filing proposed rate changes based upon a test period that would include the new investment while PSC deliberated upon the previous application. We also conclude that Bell has not clearly shown that the rate of return upon its investment is confiscatory. If it was, Bell could have asked for emergency relief on the ground of immediate and impelling necessity under Ark. Stat. Ann. § 73-216 (b).

Bell has also failed to show that the fact that the commission's order did not consider Bell's investment between June 30, 1976 and September 1, 1977, even though it was in use on the date of the order was, in this case, a violation of either the due process clauses of the Arkansas and United States Constitutions or of the prohibition against the taking of private property for public use without compensation. If Bell had shown that the rates allowed were confiscatory, then its contention would be sustained. The affidavit of Tompkin, and its supporting exhibits, showed that the rate base actually grew from $350,585,089 on June 30, 1976, to $390,877,000 on December 31, 1976, and to $412,827,000 on June 30, 1977. The parties agree that if Lampkin's unaudited valuations are used, there would be an earnings deficiency of $10,000,000. On the record before us, we are unable to say that these rates were confiscatory, as a matter of law. Bell's proposed test period was December 30, 1976, and was based largely on projections. The determination of the appropriate test period is to a great extent a matter addressing itself to the

expertise of the commission. It is extremely difficult for the courts to say that the commission's determination is erroneous, unless it is confiscatory. No problem would have presented itself to us had PSC acted within the statutory time frames.

In arriving at the conclusion that the belated action was not confiscatory, we take into consideration the fact that Bell will not be required to make refunds for collections on its proposed rates between September 29, 1976, and the date of the commission order and the fact that PSC fixed the rate of return at 8.31 percent, the rate Bell witnesses indicated would be essential to retention of its AAA bond rating.

Bell contends that, according to the holding in *Bluefield Waterworks & Improvement Co.* v. *Public Service Com'n.,* 262 U.S. 679, 43 S. Ct. 675, 67 L. Ed. 1176 (1923), the failure of PSC to consider the value of its plant at the time it made the order deprived it of due process of law. Bell quotes language from the opinion in *Bluefield* that rates which are not sufficient to yield a reasonable return on the value of the property at the time it is being used to render the service are unjust, unreasonable and confiscatory and their enforcement deprives a public utility of its property in violation of the Fourteenth Amendment. There was a different problem in *Bluefield,* however. There the commission had fixed the value of the utility's property, without giving any weight to the greatly enhanced cost of construction after World War I. The valuation used ignored the cost of reproduction of the property, basing its valuation upon the pre-war cost of construction. No new or added construction was involved in the court's decision. The court actually quoted from and relied upon its earlier opinion in *Willcox* v. *Consolidated Gas Co.,* 212 U.S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 LRA (n.s.) 1134, Ann. Cas. 1916 A 18 (1909). In that case it had been held that if the property of a utility has increased in value since it was acquired, the utility was entitled to that increase. But the court there held that the value of the property is to be determined "as of the time when the inquiry is made regarding the rates." The language quoted from *Bluefield* by Bell must be viewed in the light of the fact that *Willcox* was cited, and quoted in support of that language.

Bell also says that PSC's requirement that it pay interest at the rate of 10 percent per annum upon the refunds to be made by it is unreasonable, arbitrary and not supported by substantial evidence. Bell points out that PSC allowed the maximum interest rate permissible under Ark. Stat. Ann. § 73-217 (d), and that no evidence was introduced or offered as to the appropriate rate of interest. Bell contends that it is patently unreasonable to allow this rate of interest when, in the same order, it was held that Bell was entitled to only 8.31 percent return on its investment. The statute leaves the rate of interest to the discretion of the commission. Even though there was no evidence on the question, we may take judicial notice of the fact that interest rates are presently very high, and also were high at the time of the commission's decision. We agree with Bell that it did not have the burden of showing the interest rate appropriate to the case, or even to offer evidence on the question. We also agree that any evidence on this particular point given at a hearing would, in these times, have been rendered insubstantial by lapse of time between the hearing and the entry of the PSC order because of the steady increase in interest rates during that period. We do not think that the interest rate was dictated by Ark. Stat. Ann. § 73-214 (Repl. 1979), fixing the rate of interest to be paid upon customer deposits, although that provision might be worthy of consideration by the commission. We are unable to say, however, that there was an abuse of the commission's discretion in view of the statute allowing interest at the rate of 10 percent per annum on judgments in favor of creditors, unless the court rendering the judgment, in his discretion, reduces the rate. See Ark. Stat. Ann. § 29-124 (Repl. 1979).

The judgment of the trial court is reversed insofar as the refunds ordered by the Public Service Commission are concerned, but otherwise it is affirmed. The cause is remanded to the trial court for the entry of a judgment directing the commission to enter an order setting aside its order for a refund of refunds collected between September 29, 1976 and September 1, 1977 by Southwestern Bell Telephone Company on the basis of its proposed rates and otherwise consistent with this opinion.

STROUD and MAYS, JJ., not participating.