# ARKANSAS ELECTRIC ENERGY CONSUMERS
*v.* ARKANSAS PUBLIC SERVICE COMMISSION

CA 86-301 727 S.W.2d 146

Court of Appeals of Arkansas
En Banc
Opinion delivered April 8, 1987
[Rehearing denied May 6, 1987.]

*Wright, Lindsey & Jennings*, for appellant.

*Mary W. Cochran* and *Ivy Lincoln*, for appellee.

*Steve Clark*, Att'y Gen., by: *Mary B. Stallcup*, Deputy Att'y Gen., for appellee-intervenor, Attorney General Steve Clark.

*House, Wallace & Jewell, P.A.*, and *Mitchell, Williams, Selig, Jackson & Tucker*, for intervenor, Arkansas Power & Light Co.

MELVIN MAYFIELD, Judge. Appellant, Arkansas Electric Energy Consumers (AEEC),[1] brings this appeal from an order of the Arkansas Public Service Commission (PSC) setting rates for the six classes of customers served by Arkansas Power and Light Company (AP&L). The proceedings arise out of an AP&L rate case in which the parties agreed to the company's revenue requirement resulting from its allocation of a portion of the costs of the Grand Gulf nuclear power plant in Mississippi. As a part of that settlement, the cost allocation and rate-design issues among the customer classes of AP&L were transferred to a separate PSC docket for hearings. It is from the Commission's decision in

---

[1] AEEC is a voluntary association of industrial customers of Arkansas Power & Light Company and represents about one-third of total AP&L consumption. AEEC's members are: A.O. Smith, Acme Brick, Aluminum Company of America, Archer Daniels Midland, Banquet Foods, Cargill, Inc., Columbian Chemical Company, Conagra Frozen Foods, Cooper Tire & Rubber Co., Ethyl Corporation, Great Lakes Chemical Corporation, Halstead Metal Products, International Paper Company, Lion Oil Company, Macmillan Petroleum Products, Mid-America Packaging, Inc., Producers Rice Mill, Quincy Soybean Company, Razorback Steel, Riceland Foods, Superwood Corporation, Tyson Foods/Tastybird Foods, U.S. Vanadium Corporation, Viskase Corporation, and Weyerhaesuer Company.

that matter that this appeal was filed.

The appellant contends that the use of what are known as "risk multipliers"[2] in this case is arbitrary, unreasonable, not based on substantial evidence, and discriminatory, all in violation of Ark. Stat. Ann. Section 73-207 (Repl. 1979). Appellant also claims that the use of risk multipliers, as a general proposition, is an impermissible rate-making practice. In addition, the appellant argues that the Attorney General's participation in this proceeding was beyond his lawful authority. We affirm the Commission in all respects.

The PSC is an appellee and defends its order in this case. AP&L has intervened to support the PSC, claiming that its relations with its customers could be damaged if appellant prevails, even though the company would not see a change in its total revenues. The Attorney General has filed a brief supporting the PSC and contending that his participation in this matter is within his statutory authority.

Upon review in this court, the findings of fact of the Public Service Commission shall be conclusive if supported by substantial evidence. *Walnut Hill Telephone Co.* v. *Arkansas Public Service Commission*, 17 Ark. App. 259, 709 S.W.2d 96 (1986); Ark. Stat. Ann. Section 73-229.1 (Supp. 1985). In *Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission*, 18 Ark. App. 260, 265, 715 S.W.2d 451 (1986), we said:

> On appeal, we must give due regard to the limitations on the scope of judicial review and to the expertise of the Commission. We may not pass upon the wisdom of the Commission's actions and must defer to the expertise of the Commission, which derives its ratemaking authority from the Arkansas General Assembly. However, judicial review is not a mere formality, and it is our task to determine whether there has been an arbitrary or unwarranted abuse of the Commission's discretion, although considerable judicial restraint should be observed in finding such an abuse. It is not for this court to advise the

---

[2] Sometimes called "rate of return multipliers."

Commission how to discharge its functions in arriving at findings of fact or in exercising its discretion. The question of reasonableness of the actions of the Commission relates only to its findings of fact and to a determination of whether its actions were arbitrary. (Citation omitted.)

And in *Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission*, 19 Ark. App. 322, 327, 720 S.W.2d 924 (1986), we said:

The Commission is free, within its statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. No public utility has a vested right to any particular method of valuation or rate of return, and the Commission has wide discretion in choosing its approach to rate regulation. Generally, this Court is not concerned with the methodology used by the Commission in arriving at the result as long as the Commission's action is based on substantial evidence. It is the result reached, not the method employed or the theory, which primarily controls. Our inquiry is concluded if the Commission's decision is supported by substantial evidence and the total effect of the rate order is not unjust, unreasonable, unlawful or discriminatory. (Citations omitted.)

Furthermore, Ark. Stat. Ann. Section 73-207 (Repl. 1979) provides as follows:

No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any corporation or person or subject any corporation or person to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service. . . . The Department [Commission] may determine any question of fact arising under this section.

The Arkansas Supreme Court has said that this statute does not prohibit differences in rates, but only prohibits rate differences that are unreasonable. *See Wilson* v. *Arkansas Public Service Commission*, 278 Ark. 591, 648 S.W.2d 63 (1983).

When the parties settled the cost of the Grand Gulf rate case and the settlement was accepted by the PSC in September of 1985, it was agreed that, until issues of rate design and cost allocation could be resolved, the resulting rate increase would be apportioned among all customer classes in accordance with existing rates, so that each customer class would receive a proportionate increase. In other words, the status quo with respect to calculation of rates was maintained pending the outcome of this docket. After hearings in this matter, the Commission was not persuaded that the status quo should be changed and left the interim rates intact as permanent rates.

The parties agree that a risk multiplier is defined as a ratio of a customer class's rate of return to the overall rate of return allowed the utility by the regulatory agency. The average risk multiplier weighted for all customer classes is 1.0, because 1.0 multiplied by the utility's overall rate of return is exactly equal to the utility's overall rate of return, no more and no less. Any customer class with a risk multiplier in excess of 1.0 would, in effect, be paying a higher proportional rate of return in its overall electric rate than would a customer class with a risk multiplier of less than 1.0.

The Commission's opinion traces the history of its use of rate of return or risk multipliers (the terms are used interchangeably), in fixing rates to be charged by AP&L in Arkansas. The opinion points out that these multipliers are related to the overall cost of capital necessary to furnish electricity to the various classes of AP&L's customer.[3] The multipliers attempt to quantify the relative risk of customer classes as compared to each other and to adjust upward or downward the rates a customer class pays as a result of its own relative risk. It is also pointed out that the Commission has recognized risk differentials among customer classes and has adopted higher risk multipliers for industrial and commercial classes and lower risk multipliers for residential customers. In this case, an expert witness for the appellant testified that those who argue for risk multipliers state that industrial customers are greater risks and, therefore, should pay a

---

[3] Those classes are: Residential, Small General Service, Large General Service, Large Power Service, Large Power Special, and Miscellaneous (Lighting).

greater return on equity. However, because of the inherent problems involved with the measurement of those risks, the Commission stated it has pursued a general policy of "gradual" movement toward equality of risk multipliers, *i.e.*, to move all risk multipliers toward 1.0. The record indicates that some progress has been made in this regard, although the appellant does not believe it has been meaningful or significant and contends that any risk multiplier other than 1.0 is unlawful.

We do not agree that the use of a risk or rate of return multiplier of any number other than 1.0 is unlawful per se. Appellant's expert witness testified that, although some jurisdictions have eliminated these multipliers, four of the five states he had testified in still use them. While rates that are unduly or unreasonably discriminatory are unlawful, the appellant has cited no authority holding that risk multipliers are unlawful per se, and a number of cases cited in the PSC brief have approved rate differentials that would fall within the definition of such multipliers.

For example, in *Arkansas Louisiana Gas Co. v. Corporation Commission*, 558 P.2d 376 (Okla. 1976), the Supreme Court of Oklahoma affirmed an order that apportioned the largest part of a rate increase to the utility's industrial and high volume customers. The Commission's order found that the cost-of-service rationale no longer reflected the true value of service to customers and based its decision upon an intrinsic value-of-service rationale. This shift in rationale was based upon the desire to protect residential rate payers from more than a fair share of the rate increase, the desire to channel greater quantities of natural gas reserves to "human needs," and to discourage inefficient and wasteful consumption where alternative fuels could be substituted. In *Apartment House Council of Metropolitan Washington, Inc. v. Public Service Commission*, 332 A.2d 53 (D.C. 1975), the court affirmed an electric power company's rate increase. The Commission had held that certain "low usage customers" should not be required to "bear the burden of significant rate increases." An association of apartment house owners appealed on the basis that the differentials among classes lacked substantial evidentiary support. The court said it was "not necessary that differences in rate of return be specifically and quantitatively supported by customer class cost considerations." It also said that

evidentiary support for the Commission's conclusion appeared in its finding that there was value in "preserving historic usage patterns," and the court relied upon the Supreme Court's statement in *Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581 (1945) that:

> Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science.

*Id.* at 589. *See also United States Steel Corp. v. Pennsylvania Public Utility Commission*, 456 A.2d 686 (Pa. Commw. 1983), where the court agreed with the Commission that a cost-of-service study is merely one tool that may be used in rate-design determinations, and that noncost factors such as the ability of various classes to pay, ability to pass on the utility costs, and the value of service could also be taken into consideration.

As to whether the rates fixed in the instant case are unreasonable, it should be remembered that the Commission was concerned with the allocation of AP&L's rate-increase requirement that resulted from the Grand Gulf settlement. Rate of return or risk multipliers had been used in fixing the rates already in place, and the rates necessary under the settlement were simply increased proportionally. The utility was in favor of this action because it was not convinced that any compelling reason existed which justified a shift in rate responsibility from one class of customers to another. It also felt that the resulting instability of any such change should be avoided.

The appellant, however, opposed any use of multipliers, and its expert witness recommended that they be abolished over a period of two or three years even though large rate changes would result. On the other hand, the PSC's expert witness testified that the rate of return or risk multipliers for the appellant's customer class was reasonably close to 1.0. He also said, given the cost-of-service analysis available, he did not think the multiplier was unreasonable.

The Commission also had evidence before it that industrial customers are more elastic in their demands than residential customers and more likely to reduce consumption, adopt alternate technology, or simply leave the AP&L system in response to

rising costs of electricity. It is obvious, and the Commission noted, that loss of use from a single industrial customer is more likely to be greater than that created by even many residential customers. Based upon the record before it, the Commission found that an equal percentage increase to all customer classes, of the rates already in force, was "in the public interest." It also declined to establish a specific timetable for the eradication of risk multipliers but stated it would continue to address this issue on a case by case basis, in a manner consistent with its stated policy of gradual movement of all multipliers toward 1.0.

It is agreed that the expert witnesses faced a problem not found in most rate cases: a normal "cost-of-service" study assigning to the various customer classes their respective allocations of a utility's cost-of-service was not available. The task of cost allocation was therefore magnified, regardless of the particular methodology employed. In a normal rate case, risk multipliers can be viewed as an end result or, at the very least, can be easily calculated after the parties have finished arguing over which cost allocation methodology should be employed.[4] The only cost-of-service study available in this case, for reasons not entirely clear in the record, had to be updated by the expert witnesses based upon what they believed to be reasonable assumptions in order to make their estimates current. It is not apparent that the expert witnesses even agreed with each other as to these assumptions.

Steven Baron, appellant's expert witness, testified that for the Residential class of customers the risk multiplier was 0.83 and for the Large General Service class (composed of AEEC's members) the risk multiplier was 1.23. Dr. Keith Berry, a PSC staff witness, used a different methodology from Baron and calculated the Residential class's risk multiplier at about 0.96 and the Large General Service's risk multiplier at 1.07. The Commission adopted Dr. Berry's approach and found that the risk multipliers were "reasonably close to one." In addition, the Commission found that the risk multiplier for the Large General Service class was approximately 1.0 if an adjustment was made for the Large Power Special Class (which is composed of one

---

[4] At least four methodologies were mentioned in the record: Average and Excess Demand, Average and Peak Demand, Coincident Peak, and Probability of Dispatch.

customer: Reynolds Metals).

From our review of the voluminous record, we conclude that the Commission's decision in this case should be affirmed. The law discussed above clearly shows that there is ample authority for a rate-making agency to establish different rates for different classes of customers. Different rates are certainly related to the cost of service but, as the above cases hold, that concept involves a "myriad of facts" and other considerations are also proper. Those cases involved several considerations that are involved in this case, either in the same or similar form, and which the Commission specifically considered. We are, of course, not concerned with the methodology used by the Commission as long as it is based on substantial evidence and does not result in rates that are unlawful or unreasonable.

■ This case is not one in which the Commission has misapplied a particular formula about which there is no argument among the expert witnesses before it, a practice against which we warned in *Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission*, 19 Ark. App. 322, 720 S.W.2d 924 (1986). Instead, the Commission in this case made a decision in regard to the allocation of costs among different customer classes based upon the evidence before it, and we find that action to be supported by substantial evidence and that it does not result in rates that are unlawful or unreasonable.

Finally, appellant argues that the Attorney General's participation in this case was beyond his lawful authority as specified in Act 39 of 1981, First Extraordinary Session. That Act provides in pertinent part as follows:

> SECTION 4. The Consumer Utilities Rate Advocacy Division shall represent the State, its subdivisions and all classes of Arkansas utility rate payers . . . .

■ The Attorney General claims he is acting within his authority and that his position has been consistent with the interests of all rate payers and not any one class or classes in particular. The General Assembly charged the office of the Attorney General to represent all classes of rate payers in rate cases before the Public Service Commission. Simply because appellant perceives that representation to be inconsistent with its

own position does not mean the Attorney General has ignored his legislative mandate. If the situation were as appellant represents, the Attorney General could be effectively foreclosed from any participation whatsoever when any particular customer class perceived an inconsistency with its own position. Of necessity, the Attorney General must assert some position besides absolute neutrality in complying with the requirements of Act 39. Therefore, we do not agree with appellant's second point.

The decision of the Commission is affirmed in all respects.

Affirmed.