Winston BRYANT, Attorney General
*v.* ARKANSAS PUBLIC SERVICE COMMISSION

CA 94-487 907 S.W.2d 140

Court of Appeals of Arkansas
En Banc
Opinion delivered August 30, 1995

214

216

*Winston Bryant*, Att'y Gen., by: *Shirley E. Guntharp, Suzanne Antley, M. Shawn McMurray*, and *Virginia H. Castleberry*, for appellant Arkansas Attorney General.

*Kathleen D. Gardner*, Arkla Gen. Counsel and Vice-President, *Charles D. Harder*, Arkla Ass't Gen. Counsel, and *Wright, Lindsey & Jennings*, by: *N.M. Norton, Jr.*, and *J. Mark Davis*, for appellant Arkansas Louisiana Gas Company.

*Kenny W. Henderson*, for appellee Arkansas Public Service Commission.

*Rose Law Firm*, by: *Stephen N. Joiner*, for intervenor Arkansas Gas Consumers.

JUDITH ROGERS, Judge. In this appeal, the Consumer Utilities Rate Advocacy Division of the Attorney General's Office

has raised numerous objections to a ratemaking decision of the Arkansas Public Service Commission (Commission) that granted an increase in operating revenues to Arkansas Louisiana Gas Company (ALG). We conclude that, with respect to all issues, as the decision of the Commission was not unreasonable, arbitrary, or capricious, was based on substantial evidence, and as the Commission adequately explained the reasons for its decision, the Commission's orders must be affirmed.

ALG is a natural gas distribution division of Arkla, Inc., (now NorAm Energy Corporation), which serves more than 400,000 residential, commercial, and industrial customers through facilities in Arkansas. By an application filed with the Commission on April 9, 1993, ALG sought $15.5 million in additional revenues. Participants in the docket established by the Commission included the Attorney General, the general staff of the Commission (Staff), Arkansas Gas Consumers (AGC), Arkansas Power & Light Company, Premier Gas Company, and Vesta Energy Company. Numerous issues were raised and discussed in direct, rebuttal, and surrebuttal testimony filed by the parties. The Attorney General contended that ALG was over-recovering and proposed that ALG's rates be adjusted to eliminate revenue excess of $786,000.00. Staff recommended that ALG be allowed to recover $1,588,505.00 in additional revenues, and AGC recommended $10,196,230.00 in additional revenues. Prior to the hearing, which began on November 8, 1993, ALG reduced its requested rate increase to $12,573,584.00.

In Order No. 13, filed February 9, 1994, the Commission granted ALG additional revenues of $5,538,900.00, reflecting a total revenue requirement of $312,717,929.00. In Order No. 15, filed on April 11, 1994, the Commission corrected a discrepancy in its calculation of ALG's revenue requirement related to the application of the weighted cost of debt used in the income tax calculation that resulted in an overstatement of ALG's revenue requirement by $546,430.00. ALG was directed to file tariffs to recover additional revenues of $4,992,470.00, based on the adjusted revenue requirement of $312,171,499.00. Petitions for rehearing of the Commission orders were denied. On May 11, the Attorney General filed a notice of appeal from Orders No. 13 and 15.

## SCOPE OF REVIEW

 This court's review of Commission orders is limited and governed by Arkansas Code Annotated § 23-2-423(c) (Supp. 1993), which states in pertinent part:

(3) The finding of the commission as to the facts, if supported by substantial evidence, shall be conclusive.

(4) The review shall not be extended further than to determine whether the commission's findings are supported by substantial evidence and whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas.

In *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 24 Ark. App. 142, 751 S.W.2d 8 (1988), this court stated:

The Commission has wide discretion in choosing its approach to rate regulation, and we do not advise the Commission as to how to make its findings or exercise its discretion. Only if we find the findings of the Commission to be unsupported by substantial evidence or that the Commission has abused its discretion may we reverse. *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591 (1944); *General Tel. Co. of the Southwest v. Arkansas Pub. Serv. Comm'n*, 23 Ark. App. 73, 744 S.W.2d 392 (1988); *Walnut Hill Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 17 Ark. App. 259, 709 S.W.2d 96 (1986). The Public Service Commission is free, within the strictures of its statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. No public utility has an absolute right to any method of valuation or rate of return, and the PSC has wide discretion in its approach to rate regulation. This court is generally not concerned with the method used by the Commission in calculating rates as long as the Commission's action is based on substantial evidence. It is the result reached, and not the method used, which primarily controls. If the Commission's decision is supported by substantial evidence and the total effect of the rate order is not unjust, unreasonable, unlawful or dis-

criminatory, judicial inquiry terminates. *Southwestern Bell*, 19 Ark. App. at 327, 720 S.W.2d at 927; *Southwestern Bell Tel. Co.* v. *Arkansas Pub. Serv. Comm'n*, 18 Ark. App. 260, 715 S.W.2d 451 (1986); *Walnut Hill Tel.*, 17 Ark. App. at 265, 709 S.W.2d at 99.

24 Ark. App. at 144.

The Attorney General's arguments on appeal involve the consideration of:

(1) Plant-in-service;

(2) Construction work in progress;

(3) Incentive award payments;

(4) Mobile dispatching system expenses;

(5) Insurance costs;

(6) *Ad valorem* taxes;

(7) Allocation of the cost of distribution mains; and

(8) Allocation of the increase in revenues among customer classes.

### *Plant-In-Service*

The Attorney General first argues that the Commission erred in allowing ALG's projected plant additions and retirements, as adjusted by Staff, to be included in the calculation of rate base without requiring that the impact of those additions and retirements also be included. The Attorney General contends that to include the plant changes without including their resulting effects would be in violation of Arkansas Code Annotated § 23-4-406 (1987) and the "test year matching principle," i.e., the principle that expenses and revenues should be measured within the same time period. Section 23-4-406 provides:

For the purpose of justifying the reasonableness of a proposed new rate schedule, a utility may utilize either an historical test period of twelve (12) consecutive calendar months or a forward-looking test period of twelve (12) consecutive calendar months consisting of six (6) months of actual historical data derived from the books and records

of the utility and six (6) months of projected data which together shall be the period or test year upon which fair and reasonable rates shall be determined by the Arkansas Public Service Commission. However, the commission shall also permit adjustments to any test year so utilized to reflect the effects on an annualized basis of any and all changes in circumstances which may occur within twelve (12) months after the end of the test year where such changes are both reasonably known and measurable.

Pursuant to § 23-4-406, ALG based its application on a test year ending June 30, 1993, with the *pro forma* year ending twelve months later, June 30, 1994.

The Attorney General contends that to include the plant changes in rate base without establishing the known and measurable status of the changes is error. He maintains that plant additions and retirements can never be included in rate base because changes in customer growth and usage, or any changes in operating and maintenance expenses that will result, cannot be measured and therefore cannot be determined with certainty. He contends that because these are matters not within the control of the company, they cannot be predicted.

David E. Peterson, public utility rate consultant, testified for the Attorney General as follows:

To accurately measure a utility's income producing capability under its present or proposed rates, one must first properly match sales volumes, revenues, expenses, and plant investment used to generate those revenues and expenses. The desired matching is achieved through the use of a consistent test period. The important point is that sales, revenues, expenses, and investment all be measured at or during the same time period. This matching principle is fundamental to both accounting and ratemaking. The matching principle is violated, however, the moment we step outside of the test period to measure one element of the revenue requirement equation without similarly adjusting all other elements.

Peterson contended that ALG's 1994 customer growth adjustment was speculative because it was based on a forecast of cus-

tomer additions through the rate year. He stated that "[e]ven if we could verify all of ALG's rate base additions, there is no commitment on the customers' behalf to join the system as ALG projected or to exhibit the usage behavior that the Company expects." It was his position that, for the most part, plant additions will either generate additional revenue for ALG or will result in operating or maintenance expense reductions, and that the precise and comprehensive effects of those future changes in operations could not be determined with reasonable precision.

The Commission acknowledges that it is obligated to adjust the test year data for known and measurable changes where the changes are shown to be reliable and to reflect adjustments for both revenues and expenses. It maintains that any growth has been taken into account in the calculation of present rate revenues and further maintains that the Attorney General offered no evidence, other than Peterson's speculation, to show that any operation or expense reductions will result directly from the addition of plant-in-service. The Commission concludes that "[s]uch speculation on the part of the Attorney General's witness is simply insufficient to warrant disallowance of the proposed adjustment for known and measurable changes in plant-in-service occurring within the *pro forma* year."

The Attorney General contends, however, that the changes to plant-in-service are not "measurable" because they cannot be determined with certainty. Attorney General witness Peterson defined "measurable" as the ability to determine with reasonable precision the complete impact that the change will have on operating results.

In support of his argument, the Attorney General cites *Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission*, 18 Ark. App. 260, 715 S.W.2d 451 (1986), where this court addressed similar challenges to *pro forma* adjustments and held that known and measurable adjustments that affect test year data are proper if they can be determined with certainty. 18 Ark. App. at 270. There, Southwestern Bell argued that the Commission erred in disallowing repression adjustments that were based on the theory that, as the price of a service increases, the quantity of service demanded decreases, and therefore, a price increase is usually accompanied by a decrease in revenues realized from the sale of the service. Although the Commission

acknowledged that repression occurs, (i.e., it is "known"), it held that the evidence did not demonstrate that repression's effects could be measured with the degree of accuracy sufficient to satisfy the "measurable" standard of § 23-4-406. 18 Ark. App. at 270-71. The Commission noted that the calculations "do not take into account the expense savings associated with a decline in calling volumes, nor did they account for a number of other factors, including 'overpays,' which could affect the level of revenues recovered." 18 Ark. App. at 271. We affirmed the Commission's disallowance of the adjustment.

In that same case, however, we also affirmed the Commission's allowance of a *pro forma* adjustment imputing to Southwestern Bell the revenues and expenses associated with Yellow Page operations of a related company for both the test year and the *pro forma* year. Southwestern Bell had objected to the inclusion of the *pro forma* year revenues and expense increases, contending that they were not known and measurable. Southwestern Bell argued that the adjustment "would depend on the level of advertising purchased by Yellow Page customers as well as other factors including customers' perceptions of the effectiveness of the advertising, the growth of competition, the general state of the economy, interest rates, and tax changes affecting disposable income." 18 Ark. App. at 272. We noted, however, that the Commission had found the adjustment was based on reliable data supplied by Southwestern Bell and stated that from our review of the record, we could not say that the Commission's finding that the adjustment was reasonably known and measurable within the guidelines of § 23-4-406 was not supported by substantial evidence. *Id.*

The relevant portion of § 23-4-406 provides that the Commission shall permit adjustments to any test year "to reflect the effects on an annualized basis of any and all changes in circumstances which may occur" within the *pro forma* year "where such changes are both reasonably known and measurable." Certainly, known and measurable post-test-year changes that affect the test year data "with certainty" are proper considerations. The inquiry here is whether a complete change was considered or whether only one aspect of the change was considered.

ALG responds that the record supports a finding that oper-

ating expenses and revenues were calculated during the same period and states: "Operating revenues were projected for the *pro forma* year . . . with the aid of growth calculations to customer class billing determinants by Staff and [ALG]. Likewise, changes in [ALG] operating expenses during the *pro forma* year . . . were quantified and presented by Staff and [ALG]." ALG also points out that changes in plant additions and retirements do not necessarily increase operating revenues and decrease expenses.

The Commission relied on evidence that ALG adjusted rate base, revenues, and expenses, and that they were all measured at or during the same time period. The evidence included numerous studies and graphs prepared to aid in the determination of the proper billing determinants.[1] In its order, the Commission found that revenues had been adjusted for growth, "thereby negating" the argument that the matching principle had been violated. We find that the adjustment to plant-in-service meets the required level of "certainty," as outlined by this court in *Southwestern Bell, supra*, and the principles established in that case. We cannot say the Commission's finding is not supported by substantial evidence.

■ We do not find persuasive the Attorney General's argument that matters not completely within the control of the company cannot be measured. Utility ratemaking is an inexact art and of necessity involves judgment calls and educated surmise from time to time. *Contel of Arkansas, Inc.* v. *Arkansas Pub. Serv. Comm'n*, 37 Ark. App. 18, 22, 822 S.W.2d 850 (1992). It seems logical that analytical studies, historical data, and expert projections often must provide the basis for certain components of ratemaking.

### Construction Work in Progress

The Attorney General's next argument concerns the method by which ALG will recover debt interest and a reasonable equity

---

[1] Billing determinants define the expected units of consumption by each customer class over which each customer class's total cost responsibility is spread and thereby determine the applicable rate. Inappropriate billing determinants can result in the over- or undercollection of revenues, and the parties and the Commission devoted considerable time and study to this determination.

return on construction capital. The two approaches to this recovery have been discussed, as follows:

> One method capitalizes the carrying charges incurred during the construction period as allowance for funds used during construction (AFUDC). AFUDC is recorded part as current income, part as an offset to interest expenses, but no cash payments are made by ratepayers during construction. The payments from ratepayers to recover the carrying charges begin when the completed plant [is in service]. The entire cost of the plant (including AFUDC) is added to rate base, and it earns a rate of return on investment and is depreciated over the life of that plant. The second method is to include construction work in progress (CWIP) in the rate base. (CWIP includes accrued AFUDC on investment not in rate base.) The regulatee recovers its carrying charges currently from ratepayers through the return component of its rates, rather than adding them to the cost of construction for recovery when the plant is in service. The return on CWIP is recorded as income on a current basis (like AFUDC), and actual cash payments are made by the ratepayers currently (unlike AFUDC).
>
> Although each method is intended to provide an opportunity to recover the carrying charges, they differ primarily according to when the investment is permitted in rate base, i.e., when the carrying charges are reflected in the cost of service and thus in rates charged to ratepayers. The courts generally defer to the regulatory agency's choice of methods.

James C. Bonbright, Albert L. Danielsen, David R. Kamerschen, *Principles of Public Utility Rates* 246 (2d ed. 1988).

At the hearing, the Attorney General recommended the removal of ALG's requested allowance for construction work in progress (CWIP) from the rate base calculation, on the grounds that its inclusion would require current customers to pay for facilities that will benefit only future customers. The Attorney General offered an alternative means of achieving the proper match of customers and benefits through the testimony of Attorney General witness Peterson:

ALG is adequately compensated for its carrying costs on construction projects when it capitalizes an appropriate [AFUDC]. Thereafter, once the plant becomes operational, the Company will be able to recover its construction period costs, including all accumulated AFUDC, through the annual depreciation allowance over the useful life of the facilities. In that way, the appropriate match between service cost and service beneficiaries is achieved. This important match cannot be achieved, however, when CWIP is included in rate base.

ALG responds that its requested allowance for CWIP was in keeping with Commission precedent and was accepted by Staff. ALG witness Mickle explained:

First, Mr. Peterson has missed an overall principle of the modified balance sheet approach (MBSA) in determining a company's working capital requirements. This principle states that assets that are not interest bearing and not considered elsewhere in the cost of service, are to be included in rate base. The CWIP that ALG is using in working capital assets . . . meets each of these requirements. Second, Mr. Peterson has overlooked the fact that customers who will receive the service benefits from CWIP are ALG's present and near future customers since ALG's construction projects are almost entirely short-term in nature, some being completed within a few days' time. By including CWIP in rate base, the customers who will receive benefits from the construction projects are the same customers who will pay for them. Third and last, Mr. Peterson has failed to recognize that all CWIP does not accrue AFUDC and therefore ALG would not be adequately compensated for its carrying costs on all construction projects. AFUDC is accrued only on nonpurchase jobs over $5,000. The amount of CWIP that does not accrue AFUDC should be included in working capital assets to achieve the appropriate match between service cost and service beneficiaries.

In Order No. 13, the Commission approved the allowance of CWIP in rate base as consistent with the MBSA and the principle that the customers who receive the benefits are the same as those who will pay for them.

On appeal, the Attorney General argues that the Commission's finding in this regard is not supported by substantial evidence and is inconsistent with the supreme court's ruling in *Arkansas Power & Light Co.* v. *Arkansas Pub. Serv. Comm'n,* 226 Ark. 225, 289 S.W.2d 668 (1956). In that case, the Commission refused to allow the amount over the test period that had been invested in CWIP and was not revenue-producing. The supreme court affirmed the Commission, stating that to include the plant under construction in electric plant in calculating the rate base "would result in distortion because the Company would be permitted to earn a return on that property before it is useful in providing utility service and before the full influence of the property on revenues and expenses has been felt." 226 Ark. at 230. ALG responds that the Attorney General's reliance on the above case is misplaced, arguing:

> [E]lectric utility CWIP and gas utility CWIP are vastly different. Electric utility CWIP involves generating and transmission facilities that take years to complete, whereas gas utility CWIP involves pipeline installations that are completed in less than a year. Consequently, gas utility CWIP, such as that included in Arkla's cash working capital assets, involve capital improvements that will be used to provide service to current ratepayers at the time rates (reflecting the CWIP) are in effect.

Although we agree that, historically, CWIP has not been included in current rate base, we are mindful of the changes in the utility industry since the 1970s that have resulted in many commissions allowing all or part of CWIP in rate base in varying amounts and under varying conditions. *See* James C. Bonbright, Albert L. Danielsen, David R. Kamerschen, *Principles of Public Utility Rates* 246-253 (2d ed. 1988); and Charles F. Phillips, Jr., *The Regulation of Public Utilities* 354-55 (3d ed. 1993). We do not find it necessary, however, to examine those trends to affirm the Commission's finding in the case at bar. The theory advanced by the Attorney General assumes that the utility has a different customer base during the CWIP phase than during the operating phase. The record here refutes that assumption and demonstrates that the construction projects in issue are mostly small projects of short duration.

■ The scope of our inquiry in reviewing a decision of the Commission clearly is limited. The Commission has wide discretion in choosing its approach to rate regulation, and this court on appeal is generally not concerned with the methodology used by the Commission, as long as the Commission's action is based on substantial evidence. Here, we find that there is substantial evidence to support the Commission's finding.

### Incentive Award Payments

The Attorney General next argues that the Commission erred in allowing a projected $541,000.00 in incentive award payments to be included in ALG's expense calculation. These payments are the result of a program offered by ALG to certain employees whereby the employees receive a base salary plus a salary "at risk," which is measured by shareholder return, earnings per share, net cash flow, and total return on capital. The Attorney General contends that this expense is incurred primarily for the benefit of shareholders and not the ratepayers. He argues that the ratepayers are in a no-win situation because if the payments are made, only the shareholders will benefit from the increased earnings but if payments are not made (and the salaries are lower), the ratepayers receive no benefit, e.g., lower rates or better service. The Attorney General further argues that Attorney General witness Peterson's testimony presented sufficient analysis to support exclusion of the payments.

Peterson admitted that many utilities were moving from fixed salaries as the sole means of compensating managers and executives, to more performance-driven compensation and that incentive awards are an important management tool for employee motivation. Nevertheless, he stated that regulators should examine whether the bases for the awards are consistent with ratepayer interests:

> ALG's incentive payments for example are designed to increase Arkla, Inc.'s shareholder wealth and are based on financial, operational, and individual performance goals which include company and divisional operating income. Income and return goals are not consistent with providing service at the lowest possible cost to ratepayers. In fact, there is an incentive to artificially inflate rate increase requests and to maintain excessive rate levels.

Peterson recommended that ALG ratepayers should not be required to pay for incentive awards because investors are the primary beneficiaries when executives achieve the performance targets.

L. Dale Norwood, ALG manager of cost recovery, testified that the focus of the Commission's inquiry should be the reasonableness of the result, regardless of the method used to calculate the compensation (base salary plus salary at risk). He stated that ALG annually prepares an analysis of total employee cash compensation for each program participant and then compares the results with recent surveys of gas industry compensation for similar positions. Norwood presented an exhibit demonstrating that ALG's total employee cash compensation, both in the aggregate and for each position in 1993, was within the levels reported in the 1992 gas industry survey. He also denied that the focus of the programs was on shareholder values and stated:

> The methodology used to determine the amount of each employee's salary at risk does consider ALG's return on capital, operating income and net cash flows, as well as Arkla, Inc.'s total shareholder and ratepayer values. As a general rule, in order to achieve higher earnings, ALG management must do one or both of two things: lower costs of service and/or increase the total sales (or number of customers). Likewise, in order for ALG to achieve lower rates for customers, ALG management must lower costs and/or increase the total number of customers over which such costs are spread. Accordingly, I believe the incentive performance factors . . . consider shareholder and ratepayers concerns alike.

We find that the Commission had before it substantial evidence demonstrating that the requested adjustment for employee compensation was within the range of expert testimony and levels reported in the gas industry and that the incentive performance factors consider both shareholder and ratepayer concerns. We find no basis for concluding that the result of the Commission's finding was unjust or unreasonable.

### Mobile Dispatching Systems Expenses

The Attorney General also objects to the *pro forma* adjustment allowed for the operating expenses associated with the

mobile dispatching (MDI) systems that improve the efficiency of ALG's service personnel. The Attorney General does not dispute the Commission's finding that ALG presented sufficient cost evidence but argues that the expected efficiency gains are not quantified and included in ALG's revenue requirement calculation, as required by § 23-4-406. This section provides in part that "the Commission shall also permit adjustments to any test year so utilized to reflect the effects on an annualized basis of any and all changed circumstances which may occur within twelve (12) months after the end of the test year where such changes are both reasonably known and measurable." Attorney General witness Peterson testified that the efficiency gains or savings resulting from the MDI systems should be applied as an offset to ongoing operating costs.

ALG witness Norwood responded that the systems resulted in improved productivity and reduced labor expense. He stated that the number of employees was the lowest in several years and that the improved productivity provided by the operation of the new systems helps ALG maintain its high level of service at a relatively low cost to the customer. Norwood concluded that these costs met the "known and measurable" requirement.

Although there was no specific study of the effects of the system, we agree that ALG presented evidence that the efficiencies of the system allow ALG to maintain a previously accounted for reduction in employees, thereby avoiding employee costs. We find that the adjustment is supported by substantial evidence and the result is neither unfair nor unreasonable.

### Insurance Costs

In addition, the Attorney General objects to the $190,014.00 *pro forma* adjustment in insurance costs. He contends that the adjustment is speculative and, therefore, not known and measurable.

ALG based its adjustment on an analysis prepared by Arkla's insurance consultant, Marsh & McLennan. The Commission found that there was supporting documentation for the increase in costs and that the increase represented a known and measurable change in costs. The Attorney General argues on appeal that the following language from the analysis confirms that the adjust-

ment is based solely on speculation: "Due to the volatile nature of casualty losses, the strategic economic evaluation group cannot guarantee Arkla's ultimate losses will equal these estimates. However, we do believe the results are derived in a reasonable manner based upon the available data." ALG responds that the adjustment was derived in a reasonable manner and satisfies the requirements of § 23-4-406.

■ The Attorney General's argument is not an assertion of fact but is speculation. The Commission had the benefit of a detailed analysis that provided substantial support for the adoption of this adjustment. We find that the general disclaimer included in the report does not prevent the analysis from meeting the required level of certainty. We cannot say this adjustment is not reasonably known and measurable under the guidelines of § 23-4-406.

### Ad Valorem Taxes

The Attorney General next argues that the Commission erred in granting ALG's requested allowance for *ad valorem* taxes. In its application, ALG adjusted its *ad valorem* taxes for the *pro forma* year to reflect its requested increase to plant-in-service. The Attorney General contends that because ALG's projections of future costs are unverifiable, the *pro forma* adjustment is speculative and, therefore, not known and measurable.

■ We have affirmed the adjustment to plant, and ALG is entitled to recover the *ad valorem* taxes that will be levied on the *pro forma* plant additions. The tax rates used to calculate this adjustment were in effect at the time of the hearing. ALG witness Norwood testified that there was no reason to believe that the tax level would decrease materially in the *pro forma* year and proposed that Staff's *ad valorem* adjustment be adopted. This adjustment is known and measurable under our guidelines. The Attorney General presented no evidence to show that the tax rates would change but only speculated that they might change. Under the broad powers conferred upon the Commission, we do not find the Commission's action an abuse of discretion.

### Allocation of the Cost of Distribution Mains

The Attorney General also argues that the Commission erred in accepting ALG's allocation of the cost of distribution mains

because the Commission arbitrarily accepted an allocation methodology that the Commission had already recognized as being incorrect.

In allocating this cost, ALG applied the minimum size distribution theory, which recognizes that a minimum size main is necessary in any distribution system, regardless of peak demands or annual throughput. ALG used a main two inches or less in diameter, and the associated facilities, as the minimum size and allocated that plant among customer classes on customer number. The remaining cost of mains was allocated among customer classes on the basis of peak demand. AGC supported ALG's proposed cost allocation method. The Attorney General contended, however, that ALG's methodology allocated too much of the cost to residential and small business customers. He advocated allocating 50% of the costs on annual throughput and 50% on demand to recognize that a distribution system is designed to provide both commodity and demand. Staff proposed allocating mains on a density of customer factor and an average and peak cost allocation factor.

The parties presented considerable evidence through witnesses and studies in regard to this issue. Basil L. Copeland, Jr., an economist specializing in energy and utility economics who testified for the Attorney General, described the minimum size distribution system as "at best a polite fiction that has little or no relevance to assigning costs according to the actual factors that determine total system demand or volume." It was his opinion that the minimum distribution system concept mistakes intermediate product for final product and that it was doubtful that anyone would actually purchase such a product. Copeland testified that what customers purchase are peak-day demands and annual volumes. He also questioned why ALG had not used one-inch mains or one-half-inch mains but stated that the problem really is that there is no pipe so small that it will not supply at least some demand or capacity.

David Sullins, vice president of rates for ALG, responded that Copeland's approach ignored the realities of the system; first, that smaller consumption classes like the residential class use and are responsible for far more of the distribution grid than larger customers, and second, that ALG serves a considerable

number of residential customers in rural areas, which results in a high ratio of pipe investment per customer. Sullins admitted that ALG's method was not perfect but argued that at least it recognized some measure of this cost differential and thus is more precise than demand or volume methods. He also contended that the cost of pipe had no relationship to annual throughput. Richard A. Baudino, a utility rate and economic consultant testifying for AGC, recommended that the Commission approve ALG's allocation of distribution mains.

In its order, the Commission rejected Staff's approach, finding that further study was necessary before customer density factors could be properly developed. In discussing the Attorney General's approach, the Commission stated: "[T]he AG's approach ignores reality by dismissing the customer related costs of distribution mains. While the Commission does not necessarily disagree with the Attorney General that some smaller size distribution main may be more appropriate in determining the minimum distribution system, no party has adequately justified such a proposal." The Commission adopted ALG's allocation for purposes of this docket only.

On appeal, the Attorney General argues that the Commission was required to reject ALG's allocation method for two reasons: first, because ALG's witness testified on cross examination that perhaps a smaller-sized pipe could be used as the minimum size and that such a system of two-inch mains or less would never exist; and second, because the Commission found that a smaller size distribution main might be more appropriate. The Attorney General argues that the Commission's act of approving the allocation that the Commission itself had stated was not appropriate was "the quintessential example of an arbitrary, unwarranted abuse of discretion." It is his position that, although the Commission was obligated to reject ALG's allocation, it was not obligated to accept the Attorney General's methodology. The Attorney General contends that the Commission could have chosen a smaller size pipe to determine the minimum system or could have held a limited hearing on the issue. He requests that we remand the issue to the Commission for the determination of a more appropriate method of allocating the costs.

The Attorney General's argument disregards our scope

of review. The question on review of an administrative board's decision is not whether the evidence would have supported a contrary finding but whether it supports the finding that was made. *AT&T Communications of the Southwest, Inc.* v. *Arkansas Pub. Serv. Comm'n*, 40 Ark. App. 126, 131, 843 S.W.2d 855 (1992).

In determining the appropriate methodology to be applied in allocating this cost, the Commission gave careful and deliberate consideration to the competing claims and conflicting testimony. It is also appropriate to recognize the Commission's experience, technical competence, and specialized knowledge in this area, and the discretionary authority conferred upon the Commission. The Commission has approved the methodology in issue in prior rate cases, and the record supports the appropriateness of continuing to recognize the reality of ALG's system by allocating the mains on the basis of customer number and peak demand. A fair reading of the Commission's order does not support the Attorney General's contention that the Commission found ALG's proposed methodology incorrect or inappropriate. The Commission simply recognized that, although the use of a smaller main "may be more appropriate" in determining the minimum distribution system to allocate among customer classes on customer number, no party had adequately justified such a proposal in this proceeding. The Commission, of course, remains free to adopt a different approach when presented with a record supporting that approach.

As the trier of fact in rate cases, it is within the province of the Commission to decide on the credibility of witnesses, the reliability of their opinions, and the weight to be given their evidence. The Commission is never compelled to accept the opinion of any witness on any issue before it, nor is the Commission bound to accept one or the other of any conflicting views, opinions, or methodologies. *General Tel. Co. of the Southwest* v. *Arkansas Pub. Serv. Comm'n*, 23 Ark. App. 73, 83, 744 S.W.2d 392 (1988). Clearly, the record supports the finding that was made, and the Commission did not abuse its discretion in adopting two-inch mains and the associated facilities as the minimum size.

*Allocation of the Increase in Revenues*
*Among Customer Classes*

The Attorney General's final argument is that the Commis-

sion erred in adopting the rate design methodology proposed by ALG to apportion the total rate increase to customer classes. ALG proposed holding the rates of the industrial and large commercial customers level and collecting the increase in revenues from the residential and small commercial customers in order to minimize the risk of bypass.

The threat of bypass has only recently become a significant issue in the natural gas industry. Restructuring in the natural gas industry has changed the function of both local distribution companies (LDCs), such as ALG, and interstate pipelines. Traditionally, LDCs and the pipelines provided service in the same service area with the pipeline engaging in the transportation and wholesaling of natural gas and the LDC providing the retail distribution and sale of the gas. Pursuant to the Federal Energy Regulatory Commission's (FERC's) recent pro-competitive "open access" policy, LDCs and consumers may now purchase spot-market gas or gas directly from producers and purchase transportation from the interstate pipelines. Transportation has become a significant part of the interstate pipeline's business. Because the LDC maintains the only gas lines connecting an industrial consumer with the pipeline, LDCs have been encouraged to unbundle their services in order to transport gas owned by industrial consumers. A consumer may bypass the LDC, however, by constructing its own lines for local transportation. Bypass of a regulated utility may result in stranded investment, duplicative facilities, and higher rates for remaining customers. In a prior proceeding, the Commission discussed the effects of bypass as follows:

> When larger customers abandon the LDC, the LDC may attempt to shift the resultant lost contribution to its fixed costs to those core customers who cannot afford the option of bypass. We see this as potentially disastrous for the LDC and its core customers and, perhaps, ultimately disastrous even for the bypasser. If bypass is no longer economically advantageous, the bypasser may not have a viable LDC system to which it may return.

*Re Transportation, Bypass, and Standby Service in the Natural Gas Industry*, 84 PUR 4th 646, 649 (1987).

Michael H. Means, president and chief operating officer of ALG, discussed ALG's proposal as follows:

Consistent with the result in Docket No. 92-032-U, our proposed rate design does not increase rates to those customer classes where bypass, due to its relative ease and economy, is a very real concern. In our previous rate case these classes were allowed rate decreases in order to make substantial movement towards ending inter-class subsidies and equalizing rates of return among customer groups. In this case we propose to continue movement toward that goal by holding the rates for those classes constant. . . . [T]his still does not eradicate the subsidy, but we believe it does minimize the risk of bypass with its attendant adverse impact on all customers.

R. Todd Cooper, manager of pricing and economic analysis for ALG, presented ALG's cost-of-service study, which he stated demonstrated that ALG's largest gas customers continue to subsidize the smaller gas customers. AGC witness Baudino testified that ALG's cost-of-service study provided a reasonable basis for evaluating the relative levels of cost responsibility and rate performance between the rate classes. He presented a chart demonstrating that all industrial and commercial classes support relative rates of return substantially above a 1.0 risk multiplier, indicating that they are paying significant subsidies to the residential classes, and he recommended that the subsidies be reduced by 50%. Donna Campbell, Staff senior gas analyst, testified that, "because of the intertwining of the ALG system and its sister pipeline Arkla Energy Resources Company, some of ALG's customers are located very close to a pipeline making bypass economically feasible for certain customers."

ALG filed under seal a study of bypass capability of industrial customers. The study shows the costs that could be avoided by such customers, calculated in terms of distance from the pipeline, estimated costs of construction and finance, and the relevant payback period. ALG witness Sullins pointed out that the study shows "there are numerous examples in which large customers need not 'bear' even our present rates." He stated that several members of AGC had individually performed bypass analyses that suggest the same conclusion.

The Commission agreed with ALG that the threat of bypass by ALG's larger customers is a consideration in designing rates

and found that ALG's approach to rate design achieved an appropriate balance of economic principles and customer impact considerations.

The Attorney General, however, argues that "the larger customers are riskier (because, as ALG claims, they might bypass the company) and therefore *should* contribute a higher rate of return to the company." He recommends that the larger users be assigned a rate of return multiplier of 2.0, the small commercial users a 1.0 multiplier, and the residential users the residual revenue requirement.

AGC responds that residential and small commercial customers contribute just as much, if not more, to ALG's business risk. AGC contends that "[i]t would not be wise public policy to implement the Attorney General's 'riskiness' theory even if large customers did contribute more to ALG's business risk. A pragmatic problem with the theory is that, if adopted, it would become a self-fulfilling prophecy."

We discussed relative risks among customer classes as the bases for the apportionment of a rate increase in *Arkansas Electric Energy Consumers v. Arkansas Pub. Serv. Comm'n*, 20 Ark. App. 216, 727 S.W.2d 146 (1987). We pointed out that "risk multipliers" attempt to quantify the relative risk of customer classes as compared to each other and to adjust upward or downward the rates a customer class pays as a result of its own relative risk. We noted that historically the Commission had recognized risk differentials among customer classes and had adopted higher risk multipliers for industrial and commercial classes and lower risk multipliers for residential customers. We also noted, however, that the Commission had stated that "because of the inherent problems involved with the measurement of those risks," it was pursuing a "general policy of 'gradual' movement toward equality of risk multipliers, *i.e.*, to move all risk multipliers toward 1.0" and that the record indicated some progress had been made in that regard. 20 Ark. App. at 221. We recognized that a cost-of-service study is merely one tool that may be used in rate-design determinations and that noncost factors could also be taken into consideration. 20 Ark. App. at 222. In affirming the Commission's findings, we recognized that there was ample authority for a rate-making agency to establish different rates for

different classes of customers. We stated that different rates are certainly related to the cost of service but "that concept involves a 'myriad of facts' and other considerations are also proper." 20 Ark. App. at 224.

 Arkansas Code Annotated § 23-3-114 (1987) provides in part:

> (a)(1) As to rates or services, no public utility shall make or grant any unreasonable preference or advantage to any corporation or person or subject any corporation or person to any unreasonable prejudice or disadvantage.
>
> (2) No public utility shall establish or maintain any unreasonable difference as to rates or services, either as between localities or as between classes of service.
>
> . . . .
>
> (c) The commission may determine any question or fact arising under this section.

The supreme court has stated that the above statute does not prohibit differences in rates, but only prohibits rate differences that are unreasonable. *See Wilson* v. *Arkansas Pub. Serv. Comm'n*, 278 Ark. 591, 594, 648 S.W.2d 63 (1983).

 It is a function of the Commission to determine the relative weight to accord the various factors that it considers in the ratemaking process. The Commission's order reflects that it gave careful consideration to the testimony, cost studies, and recommendations presented by the parties. The Commission acknowledged the importance of cost of service as a criterion in the process, and it also recognized the previously stated need for a gradual movement towards eliminating interclass subsidies to prevent bypass and its attendant consequences. The Commission ultimately concluded that the allocation approved in this proceeding did not unreasonably discriminate against the residential customers.

 Here, the Commission not only balanced both cost and noncost factors but also made choices among public policy alternatives. We find that the Commission's decision has not been shown to be in excess of statutory authority or to result in unjust, unreasonable, or discriminatory rates.

■ Although we have found that the record in this case supports collecting the approved increase in revenues from the residential and small commercial customers, this opinion should not be read as advocating an inexorable march towards the application of a 1.0 risk multiplier to all classes. Retaining the system's industrial customers is an important goal. Nevertheless, all interests must be balanced to ensure that the system remains viable not only for the larger customers but also for the smaller customers. The LDC also must share some responsibility in balancing the interests. Where the LDC can be shown to have lost the contributions of industrial customers through imprudent judgments, LDC shareholders, rather than ratepayers, may be made to bear the consequences of the LDC's inability to handle competition. *See Associated Gas Distrib. v. Federal Energy Regulatory Comm'n*, 824 F.2d 981, 1036 (D.C. Cir. 1987), *cert. denied*, 485 U.S. 1006 (1988). We are confident that the Attorney General will continue to provide aggressive representation for Arkansas ratepayers in this regard.

■ Based on the record before us, we affirm the Commission's orders.

Affirmed.

COOPER, J., not participating.