The Honorable Michael Lamoureux State Representative P.O. Box 1064 Russellville, AR 72811-1064
Dear Representative Lamoureux:
I am writing in response to your request for my opinion on the following questions:
 1. Do A.C.A. §§ 14-200-103 and -104 mean that once a city and utility enter into a franchise agreement that the agreement is in effect indefinitely until the city decides to purchase the property of the utility?
 2. Can a city and utility agree to a finite time period for a franchise agreement between them or would such an agreement be prohibited by 14-200-103 or 14-200-104?
 3. Can a city and utility place other terms that would terminate a franchise agreement between them other than having the city buy the utility's property or would such terms be prohibited by 14-200-103 or 14-200-104?
 4. If a city and utility amend a franchise agreement in place by ordinance, can a city subsequently amend the ordinance to remove terms unrelated to the actual franchise tax? Would the city need the utility's agreement to the amendment before the city passed such an amendment to the ordinance?
 5. Can a city and utility amend a franchise agreement between them to increase the franchise tax if the agreement is deemed to last for an indefinite amount of time?
 6. Can a city unilaterally terminate or amend a franchise agreement for convenience or is such an action prohibited by 14-200-103 or 14-200-104?
RESPONSE
In response to your first question, A.C.A. §§ 14-200-103 and -104 provide that a utility franchise "shall be unlimited as to time," subject to termination only by the city's authorized purchase of the utility's property or termination for "misuser or nonuser" — i.e., failure of the utility to perform its functions. In my opinion, the Arkansas Public Service Commission ("PSC"), by cancellation of the utility's certificate of public convenience and necessity, is the appropriate agency to make the latter determination. In my opinion, the answer to your second question is "no": A.C.A. §§ 14-200-103 and -104 are unequivocal in declaring that the grant of a franchise "shall be unlimited as to time." In response to your third question, the only conditions that might terminate a franchise are the city's purchase of the utility's property or termination for "misuser or nonuser." In my opinion, any contractual provisions reciting additional grounds for termination would be unlawful. In response to your fourth question, unless a franchise agreement specifies otherwise, subject to PSC review for reasonableness, I believe a city by ordinance may change all terms and conditions of a franchise except the duration of the franchise. In my opinion, this power of amendment includes what you call the "franchise tax" — i.e., the franchise fee. With respect to your fifth question, assuming the city and a utility have set a particular franchise fee by contract, I believe the parties might change that fee by mutual assent. If no franchise agreement commits the utility to pay a specified fee, I believe the city by ordinance may unilaterally impose a higher, reasonable fee that does not exceed the cap set forth at A.C.A. § 14-200-101. Any fee imposed above that cap must be by mutual consent or by vote of the people. With respect to your sixth question, I do not believe a city can unilaterally terminate a utility franchise. However, unless a franchise agreement expressly indicates otherwise, I believe A.C.A. § 14-200-101 authorizes a city by ordinance to amend the terms of a franchise subject to PSC review for reasonableness.
Question 1: Do A.C.A. §§ 14-200-103 and -104 mean that once a city andutility enter into a franchise agreement that the agreement is in effectindefinitely until the city decides to purchase the property of theutility?
Chapter 200 of title 14 of the Code deals with municipal authority over utilities. Section 14-200-103 of the Code (Repl. 1998) provides:
 (a) All permits, licenses, or franchises granted by any municipality to any public utility authorizing it to occupy the streets, highways, alleys, and other public ways in the municipality, for the purpose of constructing and maintaining any facilities for the supplying of any public service or commodity, shall be unlimited as to time.
 (b) The utility or its successors and assigns shall hold the permit, license, or franchise in accordance with the terms, conditions, and limitations of this act and any future regulatory acts.
 (c) The permit, license, or franchise shall continue in force until such time as a municipality having authority to do so shall purchase the property operating under such permit, license, or franchise in accordance with the provisions of this act, or until terminated according to the law for misuser or nonuser.
Section 14-200-104 of the Code (Repl. 1998) provides:
 Any permit, license, or franchise heretofore granted to a public utility by the state or a municipality to occupy the streets, highways, alleys, or other public ways of any municipality for the purpose of carrying on any of the public services defined in this act, is amended in such manner that the permit, license, or franchise shall continue in force until such time as the municipality having authority to do so shall purchase the property operated under the permit or franchise in accordance with the terms and provisions of this act or until terminated according to law for misuser or nonuser.
These statutes provide that a franchise will continue in effect until (1) the municipality elects to purchase the franchisee's property or (2) the franchisee is adjudged out of compliance owing the "misuser or nonuser." To illustrate the latter contingency, the court noted in Veteran'sTaxicab Company v. City Of Fort Smith, 213 Ark. 687, 693, 212 S.W.2d 341
(1948):
 Appellant paid no fees after January 1, 1947, nor began the operation of any cabs under its permit until after the show-cause order had been served. These omissions made a prima facie case to justify revocation of appellant's permit for noncompliance with ordinance 1969, and for nonuser. In 43 Am. Juris. 585, "Public Utilities and Services," 21, in speaking of the forfeiture of a permit, this appears:" As is true of franchises generally, a franchise granted to a public service corporation may be forfeited for misuser or nonuser." See, also, Pond on Public Utilities, 4th Ed., 464, where this appears: "Where, however, the municipal public utility fails or refuses for an unreasonable time to install its plant and provide service, the courts will not hesitate to declare its special franchise privileges to be forfeited on account of their nonuser."
The court further remarked:
 When a regulatory body issues a permit based on a finding of public convenience and necessity, the grantee must begin operations under the permit within due time, unless such operations are excused by the regulatory body or enjoined by a court. The granting of a certificate of public convenience and necessity is based on the premise that the public will be served by the grantee of the permit; and the grantee cannot hold the permit and — at the same time — refuse to serve the public because of the possibility of unfavorable appellate court action. Such a refusal would deprive the public of the services which the permit was supposed to ensure. In 43 Am. Juris. 584," Public Utilities and Services," 20, this appears: "In every grant of a public utility franchise, there is implied an agreement on the part of the grantee that it will be exercised . . ."
Section 14-200-101 of the Code provides that any municipality, "by ordinance or resolution of its council," may exercise jurisdiction to charge a utility a "reasonable franchise fee," the amount of which is subject to review by the PSC. Section 14-54-704 of the Code further authorizes "the mayor and city council, or the other governing bodies of municipalities having a commission, administrator, or city manager form of government" to contract with utilities for the use of "the streets, alleys, and public grounds of the municipality for such purposes, on such rates, charges, and terms as may be agreed upon."
Notwithstanding the reference in your question to a "franchise agreement," A.C.A. §§ 14-200-103 and -104 provides only that any "permits, licenses, or franchises . . . shall be unlimited as to time," subject to the conditions discussed above. The statutes are silent on the question of whether a formal "franchise agreement" exists, instead focusing only on the term of the franchise recognized by city ordinance or resolution as referenced in A.C.A. § 14-200-101. Also pertinent to the term of a franchise is A.C.A. § 23-3-201(a), as amended byAct 304 of 2003, which provides that no public utility may construction or operate without first obtaining "a certificate that public convenience and necessity require, or will require, such construction or operation."
Notwithstanding the provisions of A.C.A. § 14-200-101, then, the PSC, as opposed to a city council, has independent and ultimate authority to determine whether a franchise shall issue. The PSC further has exclusive rate-setting authority over electric, gas, telephone and sewer public utilities. A.C.A. § 23-4-201. It is further well established that the PSC has the authority to revoke a certificate if it determines that the public good will be served thereby. In Redfield Telephone Company v.Public Service Commission, 273 Ark. 498, 501-02, 6221 S.W.2d 470 (1981), the Arkansas Supreme Court remarked:
 Appellant argues that the Commission does not have authority to revoke its Certificate because revocation is a judicial as opposed to a legislative function. But, we held otherwise in Veterans Taxicab Co. v. City of Fort Smith, 213 Ark. 687, 212 S.W.2d 341 (1948) where we affirmed the Fort Smith City Commission's legislative revocation of a taxi franchise. In Delaware Coach v. Public Service Commission, 265 F. Supp. 648 (1967), it was stated that since granting or withholding certification to a public utility is a legislative function, the determination to revoke must also be legislative in character.
 The Commission itself has long recognized it has the power to revoke a certificate, as evidenced by Re R.V. Taylor, 69 PUR 3d 205 (Ark. 1967):
 [A] telephone company . . . must first obtain from this commission a certificate of convenience and necessity authorizing it to provide local telephone service. If thereafter, the public utility fails to render adequate service to the residents in the area which it professes to serve, the commission can cancel the certificate of convenience and necessity and so make the area available for service by another telephone company.
 Appellant next argues that even if revocation is a legislative function, it has not been delegated to the Commission by the legislature. We have held to the contrary. The legislature has delegated and entrusted the administration of the Public Utilities Act to the Commission. Ark. Power Light Co. v. Ark. Public Service Commission, 226 Ark. 225, 289 S.W.2d 668 (1956); Dept. of Public Utilities v. Arkansas Louisiana Gas Co., 200 Ark. 983, 142 S.W.2d 213
(1940). The Commission was created to act for the General Assembly, and it has the same power that body would have when acting within the powers conferred upon it by legislative act. Southwestern Bell Telephone Co. v. Ark. Public Service Commission, 267 Ark. 550, 593 S.W.2d 434 (1980).
This power to revoke is implicit in the legislature's broad grant of authority to the PSC:
 The commission is vested with the power and jurisdiction, and it is made its duty, to supervise and regulate every public utility defined in 23-1-101 and to do all things, whether specifically designated in this act, that may be necessary or expedient in the exercise of such power and jurisdiction, or in the discharge of its duty.
A.C.A. § 23-2-301. Subsection 23-2-426(a) of the Code further provides:
 The commission may at any time, and from time to time, after notice, and after opportunity to be heard as provided in the case of complaints, rescind, or amend by order any decision made by it.
As the court observed in Redfield, 273 Ark. at 502:
 Courts in other states with similar statutes have held that a Commission has the power to revoke a Certificate, reasoning that the statutory power to rescind its decisions necessarily entails the authority to revoke a Certificate. Day v. Public Service Commission, 312 Pa. 381, 167 A. 565 (1933); Davis v. Corporation Commission, 96 Ariz. 215, 393 P.2d 909 (1964); Northfield Woods Water Utility Co. v. Illinois Commerce Commission, 28 Ill. App.3d 664, 329 N.E.2d 295
(1975).
To summarize, the durational terms of the franchises referenced in A.C.A. §§ 14-200-103 and -104 are subject to the city's right to buy out the franchise and to the PSC's authority to revoke a certificate for "misuser or nonuser." In my opinion, the qualified "unlimited" term of a franchise under these statutes serves to protect a utility's significant capital investment and to ensure its ongoing right to do business so long as it serves the public in doing so.
Question 2: Can a city and utility agree to a finite time periodfor a franchise agreement between them or would such an agreementbe prohibited by 14-200-103 or 14-200-104?
In my opinion, A.C.A. §§ 14-200-103 and -104 are unequivocal in declaring that the grant of a franchise "shall be unlimited as to time." As the Arkansas Supreme Court noted in Woodend v. Southland Racing Corp.,337 Ark. 380, 384, 989 S.W.2d 505 (1999): "It is . . . well settled that the law in effect at the time a contract is made forms a part of the contract as if it had been expressed in the contract. Mahurin v. Oaklawn JockeyClub, 299 Ark. 13, 771 S.W.2d 19 (1989)." Accordingly, I do not believe a city and a utility could negotiate a franchise for a finite time period.
Question 3: Can a city and utility place other terms that would terminatea franchise agreement between them other than having the city buy theutility's property or would such terms be prohibited by 14-200-103 or14-200-104?
In my opinion, under the statutes, the only conditions that may result in termination of the franchise are the city's purchase of the franchisee's property or "misuser or nonuser." As noted in my response to your first question, the PSC has the discretion to terminate a franchise by revoking the franchisee's certificate, presumably as the result of "misuser or nonuser." Given these statutory directives, I believe any contractual provision purporting to recite additional bases for terminating the franchise would be void.
Question 4: If a city and utility amend a franchise agreement in place byordinance, can a city subsequently amend the ordinance to remove termsunrelated to the actual franchise tax? Would the city need the utility'sagreement to the amendment before the city passed such an amendment tothe ordinance?
I am uncertain what you mean in referring to "a franchise agreement in place by ordinance." Section 14-200-101 of the Code authorizes cities unilaterally to condition by ordinance a utility's operations:
 (a)(1) Acting by ordinance or resolution of its council, board of directors, or commission, every city and town shall have jurisdiction to:
 (A) Except as provided in § 23-4-201,[1] determine the quality and character of each kind of, and rates for, product or service to be furnished or rendered by any public utility within the city or town and all other terms and conditions, including a reasonable franchise fee,
upon which the public utility may be permitted to occupy the streets, highways, or other public places within the municipality, and the ordinance or resolution shall be deemed prima facie reasonable, provided that no franchise fee shall exceed the higher of the amount in effect as to that entity on January 1, 1997, or four and one-quarter percent (4 1/4%), unless agreed to by the affected utility or approved by the voters of the municipality[.]
(Emphasis added.) As the highlighted language suggests, so long as it acts reasonably and does not exceed the recited levels of fees, the city council can simply impose the fees by ordinance without utility approval. See City of Little Rock v. ATT Communications of theSouthwest, Inc., 318 Ark. 616, 620, 888 S.W.2d 290 (1994) (characterizing franchise fees as "in form, rental payments for a public utility's use of the municipality's right-of-way" and noting that they are "deemed prima facie reasonable"). I do not believe any such ordinance would qualify as a "franchise agreement" of the sort a city and a utility might negotiate.
Of course, an ordinance might acknowledge the existence of a separate franchise agreement setting forth the respective rights of a city and a utility. In theory, such an agreement might commit the city to charge the utility only a specified franchise fee over a specified period of time, in which case the city would be obligated by its contractual commitment. However, in my opinion, absent such a contractual commitment, the city would remain free to amend an ordinance setting a franchise fee or defining "the terms and conditions" of a utility's service without the utility's approval so long as the amendment was "reasonable" and did not without authorization exceed the fee caps set forth at A.C.A. §14-200-101. Any such amendment would be subject to review by the PSC pursuant to A.C.A. § 14-200-101(b) in order to determine whether it was "unjust, unreasonable, or unlawful."
Question 5: Can a city and utility amend a franchise agreement betweenthem to increase the franchise tax if the agreement is deemed to last foran indefinite amount of time?
As the court noted in Crain Industries, Inc. v. Cass, 305 Ark. 566, 575,810 S.W.2d 910 (1991), "[g]enerally a contract cannot be modified unilaterally, Leonard v. Downing, 246 Ark. 397, 438 S.W.2d 327 (1969);Scottish Union and Nat. Ins. Co. v. Wilson, 183 Ark. 860, 39 S.W.2d 303
(1931)." However, irrespective of the term of the contract, if a city and a utility have contractually agreed to a particular franchise fee, under standard principles of contract law, they could modify their agreement if they mutually agree to do so. See, e.g., Kennedy v. Kennedy,53 Ark. App. 22, 25, 918 S.W.2d 197 (1996). As the court noted in Freeman v.Freeman, 20 Ark. App. 12, 16, 722 S.W.2d 877 (1987): "Mutual promises . . . constitute consideration, each for the other. Afflick v. Lambert,187 Ark. 416, 60 S.W.2d 176 (1933)."
Having offered this opinion, I should again note that absent a contractual provision to the contrary, I believe a city has the statutory right pursuant to A.C.A. § 14-200-101 reasonably to modify franchise fees, subject to review by the PSC. Although A.C.A. §§ 14-200-103 and -104 provide that a franchise will last indefinitely, subject to the qualifications discussed above, I do not believe these statutes can or should be read as meaning that the franchise fees must forever remain frozen. In my opinion, the PSC properly serves as the arbiter to ensure that the franchise fees remain reasonable over time.
Question 6: Can a city unilaterally terminate or amend a franchiseagreement for convenience or is such an action prohibited by 14-200-103or 14-200-104?
As implied in the foregoing, I believe A.C.A. §§ 14-200-103 and -104 preclude a city from unilaterally terminating a franchise agreement. In my opinion, only the PSC is authorized to undertake such an action. However, unless a franchise agreement expressly dictates otherwise (a provision I consider highly unlikely), a city is authorized to make reasonable adjustments in franchise fees pursuant to A.C.A. § 14-200-101.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh
[1] The referenced statute grants the PSC the exclusive authority to set the rates a utility may charge its customers. See City of Fort Smithv. Arkansas Public Service Commission, 278 Ark. 521, 648 S.W.2d 40 (1983) (holding that A.C.A. § 23-4-201 divests cities and towns of any jurisdiction A.C.A. § 14-200-101 might otherwise have granted them to determine utility service rates).